**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SYLVIA SPENCER; TED YOUNGBERG;
VICKI HULSE,
              *Plaintiffs-Appellants,*

              v.

WORLD VISION, INC.,
              *Defendant-Appellee.*

No. 08-35532

D.C. No.
2:07-cv-01551-RSM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
July 8, 2009—Seattle, Washington

Filed August 23, 2010
Amended January 25, 2011

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld and
Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Kleinfeld;
Dissent by Judge Berzon

**COUNSEL**

Judith A. Lonnquist, Law Offices of Judith A. Lonnquist, P.S., Seattle, Washington, argued the cause for the plaintiffs-appellants and filed the briefs.

Steven T. O'Ban, Ellis, Li & McKinstry PLLC, Seattle, Washington, argued the cause for the defendant-appellee and filed the brief. Daniel J. Ichinaga, Ellis, Li & McKinstry PLLC, Seattle, Washington, was also on the brief.

Lowell V. Sturgill, Civil Division, U.S. Department of Justice, Washington, District of Colombia, argued the cause and filed a brief on behalf of amicus curiae the United States. Gregory G. Katsas, Assistant Attorney General, U.S. Department of Justice, Washington, District of Colombia, and Marleigh D. Dover, Civil Division, U.S. Department of Justice, Washington, District of Colombia, were also on the brief.

L. Martin Nussbaum, Rothgerber Johnson & Lyons LLP, Colorado Springs, Colorado, filed a brief on behalf of amici curiae Christian Legal Society, Association of Gospel Rescue Missions, Center for Public Justice, National Association of Evangelicals, Samaritan's Purse, and Union of Orthodox Jewish Congregations of America. Gregory S. Baylor, Christian Legal Society, Springfield, Virginia, was also on the brief.

Kevin H. Theriot, Alliance Defense Fund, Leawood, Kansas, filed a brief on behalf of amici curiae Alliance Defense Fund and Youth for Christ. Ben Bull, Alliance Defense Fund, Leawood, Kansas, and Joel Oster, Alliance Defense Fund, Leawood, Kansas, were also on the brief.

Eric Bently, Holme Roberts & Owen LLP, Colorado Springs, Colorado, filed a brief on behalf of amici curiae Association of Christian Schools International and Council for Christian Colleges and Universities. Stuart J. Lark, Holme Roberts & Owen LLP, Colorado Springs, Colorado, was also on the brief.

---

## ORDER

The opinion filed in this case on August 23, 2010, and reported at 619 F.3d 1109, is hereby amended. An amended opinion is filed concurrently with this order.

With this amendment, Judge O'Scannlain has voted to deny the petition for rehearing en banc, and Judge Kleinfeld has so recommended. Judge Berzon has voted to grant the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED. No subsequent petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

PER CURIAM:

A majority of the panel (Judges O'Scannlain and Kleinfeld) holds that World Vision, Inc. qualifies as an entity exempt

under 42 U.S.C. § 2000e-1(a) from Title VII's general prohibition against religious discrimination. Judges O'Scannlain and Kleinfeld concur that an entity is eligible for the section 2000e-1 exemption, at least, if it is organized for a religious purpose, is engaged primarily in carrying out that religious purpose, holds itself out to the public as an entity for carrying out that religious purpose, and does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts.

For the reasons set forth in the opinions of Judges O'Scannlain and Kleinfeld, the district court's grant of summary judgment to World Vision, Inc. is

AFFIRMED.

---

O'SCANNLAIN, Circuit Judge, concurring:

We must decide whether a faith-based humanitarian organization is exempt from Title VII's prohibition against religious discrimination.

I

Silvia Spencer, Ted Youngberg, and Vicki Hulse were terminated by World Vision, Inc. ("World Vision") on account of their religious beliefs. Religious discrimination is, of course, barred by Title VII of the Civil Rights Act. *See* 42 U.S.C. § 2000e-2(a). That bar, however, does not apply to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." *Id.* § 2000e-1(a). World Vision's eligibility for this exemption is the issue presented in this appeal.

## A

World Vision describes itself as "a Christian humanitarian organization dedicated to working with children, families and their communities worldwide to reach their full potential by tackling the causes of poverty and injustice." What began in 1950, when Dr. Robert Pierce started sending a monthly donation to a child in China, has become World Vision International ("WVI"): a federation of eighteen independent and thirty-four semi-autonomous entities operating in countries around the world. World Vision—the party to this case—is the U.S. arm of WVI.

Spencer and Hulse had both worked for World Vision for approximately ten years prior to their dismissal. Spencer provided various services related to the upkeep and maintenance of the organization's technology and facilities, and Hulse was responsible for miscellaneous office tasks, such as scheduling and telephone coverage. Youngberg worked for World Vision for almost two years; his duties included coordinating shipping and facilities needs as well as scheduling.

When they were hired, Spencer, Hulse, and Youngberg (collectively, the "Employees") submitted required personal statements describing their "relationship with Jesus Christ." *See infra* pp. 1428-29. All acknowledged their "agreement and compliance" with World Vision's Statement of Faith, Core Values, and Mission Statement. *See infra* pp. 1422-23, 1429.

In 2006, World Vision discovered that the Employees denied the deity of Jesus Christ and disavowed the doctrine of the Trinity.[1] As this was incompatible with World Vision's doctrinal beliefs—specifically, the belief that "there is one

---

[1]That is, the Christian doctrine which, as stated by World Vision, describes God the Father, Jesus Christ, and the Holy Spirit as three persons but one being.

God, eternally existent in three persons: Father, Son, and the Holy Spirit"—the Employees were terminated. *See infra* p. 1422-23.

B

The Employees lodged their complaint in the U.S. District Court for the Western District of Washington, alleging discrimination in violation of Title VII of the Civil Rights Act. In response, World Vision filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). On the Employees' motion, the district court converted World Vision's request into a motion for summary judgement and allowed discovery to proceed.

Ultimately, the district court granted summary judgment to World Vision, concluding that it was a religious entity within the meaning of 42 U.S.C. § 2000e-1. *Spencer v. World Vision, Inc.*, 570 F. Supp. 2d 1279, 1280 (W.D. Wash. 2008). In making this determination, the district court decided that the factors discussed in *EEOC v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458 (9th Cir. 1993), "d[id] not provide an accurate framework . . . to determine whether a religious organization that is not an educational institution is entitled to Title VII exemption." *Id.* at 1285. The court instead relied on the factors discussed in *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217 (3d Cir. 2007). *Id.* at 1285-86. Consideration of those nine factors led the court to hold that World Vision's "purpose and character are primarily religious," and thus, the organization fell within the language of 42 U.S.C. § 2000e-1. *Id.* at 1289.

The Employees timely appealed.

II

**[1]** There is no dispute that the Employees were fired for

religious reasons. For purposes of this appeal,**²** such termination was permissible if—and only if—World Vision is a "religious corporation, association, . . . or society" under 42 U.S.C. § 2000e-1(a). Our only inquiry, therefore, is a de novo review of the district court's summary judgment that World Vision qualifies for the exemption. *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) ("Viewing the evidence in the light most favorable to the plaintiffs, we must determine whether there are any genuine issues of material fact and whether the [district court] correctly applied the relevant substantive law.").**³**

A

Typically, the question of whether an organization is religious for purposes of section 2000e-1 warrants little analysis. In most cases, the organization seeking the exemption is "clearly" religious, and the result is straightforward. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988). No one would dispute, for example, that the Church of Jesus Christ of Latter-Day Saints is a religious organization. *See, e.g., Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987).

**[2]** We have twice addressed this question where the result was less than obvious. In *Townley*, we decided that a for-profit manufacturer of mining equipment did not qualify for the exemption. 859 F.2d at 619. We characterized our inquiry as an effort "to determine whether the 'general picture' of [an] institution is *primarily religious* or secular." *Id.* at 618 n.14

---

**²**Because World Vision has not relied on any constitutional right to hire and fire on the basis of religion, we do not comment on that possibility.

**³**The nature of the Employees' duties is irrelevant to our analysis. If World Vision qualifies for the exemption, it is entitled to terminate employees for exclusively religious reasons, without respect to the nature of their duties. *See* 42 U.S.C. § 2000e-1(a).

(emphasis added). In making that determination, we emphasized that "each case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious. Only when that is the case will the corporation be able to avail itself of the exemption." *Id.* at 618. We also analyzed the "far from comprehensive" legislative history of section 2000e-1, speculating that when it enacted the exemption, Congress "assumed that only those institutions with extremely close ties to organized religions would be covered. Churches, and entities similar to churches, were the paradigm." *Id.* at 617-18 ("[T]he central function of section 702 has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities."). Institutions "merely 'affiliated' with a religious organization" would not qualify. *Id.* at 617.

In *Kamehameha*, we reaffirmed *Townley* while concluding that two private educational institutions did not qualify for the section 2000e-1 exception. 990 F.2d at 460. We further explained that section 2000e-1 would be construed "narrowly," and the institution seeking the benefit of the statute would "bear the burden of proving [it is] exempt." *Id.* Applying *Townley*'s "primarily religious" test, we weighed the secular and religious characteristics of the schools, specifically referencing their (1) ownership and affiliation, (2) purpose, (3) faculty, (4) student body, (5) student activities, and (6) curriculum. *Id.* at 461-63.

**[3]** Ours has not been the only circuit to consider scope of the section 2000e-1 exemption. In *LeBoon*, the Third Circuit concluded that a Jewish community center was a religious organization within the meaning of section 2000e-1. In doing so, it agreed with *Townley* that the proper inquiry involved a weighing of " '[a]ll significant religious and secular characteristics.' " *LeBoon*, 503 F.3d at 226 (alteration in original) (quoting *Townley*, 859 F.2d at 618). The court then consid-

ered nine factors other "courts have looked at" in determining whether an entity qualified for section 2000e-1:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*Id.* (citing *Kamehameha*, 990 F.2d 458 and *Townley*, 859 F.2d at 618-19). The Third Circuit added the caveat that "not all factors will be relevant in all cases, and the weight given each factor may vary from case to case." *Id.* at 227. The court also noted that the section 2000e-1 exemption should not be denied to institutions because they, inter alia, engage in some secular activities, do not adhere to the strictest tenets of their faith, or do not hire only coreligionists. *Id.* at 229-30.

1

The Employees' first contend that by applying the nine factors set forth in *LeBoon*, rather than the six factors laid out in *Kamehameha*, the district court violated Ninth Circuit precedent. The Employees argue that *LeBoon* "explicitly rejected the Ninth Circuit's narrow interpretation of § 2000e-1"—a narrow interpretation the Employees assert limits the exemption to "churches, synagogues, and the like" or "[c]hurches,

and entities similar to churches." *Townley*, 859 F.2d at 618 & n.14

**[4]** Despite the Employees' protestations to the contrary, our interpretation of section 2000e-1 is not as "narrow" as they would have it. First, in Townley, we did not confine our inquiry to considering whether the manufacturing firm at issue was essentially a church. Rather, we weighed all relevant religious and secular characteristics to determine whether the company at issue was "primarily religious or secular" in nature. *See id.* at 618-19. Moreover, *Townley*'s allegedly limiting language— "[c]hurches, and entities similar to churches" —appears in its discussion of section 2000e-1's legislative history, a discussion on which our holding did not depend. *See id.*; *see also Kamehameha*, 990 F.2d at 460 n.5 ("In any event, the test the court adopted in *Townley* does not depend on an analysis of the legislative history.").[4] At the least, the comment seems more appropriately characterized as a "suggestion" rather than a strict rule. *LeBoon*, 503 F.3d at 230.

**[5]** Second, the reading of section 2000e-1 propounded by the Employees is belied by the text of the statute. Congress extended the exemption to any "religious corporation, association, . . . or society." 42 U.S.C. § 2000e-1(a). If Congress had intended to restrict the exemption to "[c]hurches, and entities similar to churches" it could have said so. Because Congress did not, some religious corporations, associations, and societies that are *not* churches must fall within the exemption.[5]

---

[4]Similarly unavailing is any reliance on Townley's statement that "the central function of section 702 has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities." 859 F.2d at 618. The statement was merely descriptive in nature: it followed a string citation and summarized the manner in which the exemption had been applied. *See id.*

[5]Our dissenting colleague would also embrace such a narrow interpretation. She contends that the terms "religious association," "religious corpo-

**[6]** Third, the canon of constitutional avoidance counsels against the Employees' stringent interpretation of section 2000e-1. *See NLRB v. Catholic Bishop*, 440 U.S. 490, 500 (1979) ("[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available."). In *Townley* itself, we noted that the Free Exercise Clause "clearly" protects "organizations less pervasively religious than churches." 859 F.3d at 620 n.15; *see also id.* at 618 n.13 (explaining that even absent the exemption for religious organizations, "the First Amendment would limit Title VII's ability to regulate the employment relationships within churches and similar organizations"). Moreover, the Employees' reading also potentially runs afoul of the Establishment Clause's core command of neutrality among religious groups. *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("[The] clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). As the United States argues as amicus, interpreting the statute such that it requires an organization to be a "church" to qualify for the exemption would discriminate against religious institutions which "are organized for a religious purpose and have sincerely held religious tenets, but are not houses of worship." *See* Thomas M. Messner, *Can Parachurch Organizations Hire and Fire on the Basis of Religion Without Violating Title VII?*, 17 U. Fla. J.L. & Pub. Pol'y 63, 69-71 (2006) (listing numerous such "parachurch" organizations); *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008). It would also raise the specter of constitutionally impermissible discrimination between institutions on the basis of the "pervasiveness or intensity" of

ration," and "religious society" are all synonyms for "church." Dissent at 1452-57. This interpretation "is . . . at odds with one of the most basic interpretive cannons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.' " *Corley v. United States*, 129 S. Ct. 1558, 1566 (2009) (second alteration in original) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

their religious beliefs. *Colo. Christian*, 534 F.3d at 1259; *see also Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1342 (D.C. Cir. 2002) ("[A]n exemption solely for 'pervasively sectarian' schools would itself raise First Amendment concerns— discriminating between kinds of religious schools."). Thus, the cramped reading of the exemption put forth by the Employees raises serious questions under both the Free Exercise Clause and the Establishment Clause. As we must, we reject this constitutionally questionable interpretation.

That said, there is no denying that we have held that section 2000e-1 should be construed "narrowly." *Kamehameha*, 990 F.2d at 460. But the same panel which held that a narrow construction was necessary found nothing contradictory between such a reading and *Townley*'s requirement of a case-by-case weighing of " '[a]ll significant religious and secular characteristics . . . to determine whether the corporation's purpose and character are primarily religious.' " *Id.* (quoting *Townley*, 859 F.2d at 618). Analysis of additional or alternative factors cannot contravene circuit precedent which explicitly mandates consideration of " '[*a*]*ll* significant religious and secular characteristics.' " *Id.* (emphasis added).

[7] In sum, when confronted with a section 2000e-1 case, *Townley* and *Kamehameha* require us to analyze, on a case-by-case basis, whether the "general picture" of an organization is "primarily religious," taking into account "[a]ll significant religious and secular characteristics."[6]

---

[6]We acknowledge that this "primarily religious" test is in tension with precedent from outside our circuit which has struck down related tests in different contexts. *See Colo. Christian*, 534 F.3d at 1250 (striking down a state statute which provided "scholarships to eligible students who attend any accredited college in the state—public or private, secular or religious —other than those the state deems 'pervasively sectarian' " (emphasis added)); *Great Falls*, 278 F.3d at 1343 (striking down an inquiry which "boil[ed] down to 'is [an entity] sufficiently religious' ").

2

Though our precedent provides us with the fundamental question—whether the general picture of World Vision is primarily religious—we must assess the manner in which we are to answer that question in the case at hand. Again, we are told that we must evaluate "[a]ll significant religious and secular characteristics." *Townley*, 859 F.2d at 618. The Employees insist that this means we should analogize and apply the *Kamehameha* factors. World Vision urges us to do the same with those considered in *LeBoon*.

a

Of course, our caselaw does not compel us to march down a checklist of considerations. Quite the contrary, we have never "attempt[ed] to outline [section 2000e-1's] precise scope," concluding instead that "each case must turn on its own facts." *Townley*, 859 F.2d at 618. We would thus be remiss to hold that factors which are "significant" in one case must be similarly "significant" in all others. As the Third Circuit trenchantly observed, "not all factors will be relevant in all cases, and the weight given each factor may vary from case to case." *LeBoon*, 503 F.3d at 227. Our past precedent tracks this methodology. We did not consider identical "factors" in *Kamehameha* and *Townley*. *Compare Townley*, 859 F.2d at 619, *with Kamehameha*, 990 F.2d at 461-63. This makes eminent sense. After all, *Kamehameha* involved an educational institution. *Townley* involved a for-profit manufacturing company. Thus, it should come as no surprise that dogmatic application of the factors set forth in *Kamehameha* —several of which were explicitly tailored to schools—is inapt when we consider the status of World Vision. As a nonprofit humanitarian relief organization, World Vision is a different animal.

Rigid adherence to the *LeBoon* factors is also unwarranted, though for several additional reasons. As an initial matter,

applying some of the factors set forth in that opinion to entities such as World Vision could create several oddities. To take just one example, *LeBoon* could be read to ask us to consider whether World Vision's "members"—here, its employees—are coreligionists. *See LeBoon*, 503 F.3d at 226. But if World Vision does not qualify for the exemption, hiring employees on the basis of their religion would constitute a gross violation of Title VII. We will not encourage organizations to take actions that might otherwise be illegal in order to boost their chances to qualify for the exemption. *See Killinger v. Samford Univ.*, 113 F.3d 196, 199-200 (11th Cir. 1997) ("We are also aware of no requirement that a religious educational institution engage in a strict policy of religious discrimination—such as always preferring Baptists in employment decisions—to be entitled to the exemption.").

b

Even more importantly, several of the *LeBoon* factors could be constitutionally troublesome if applied to this case. For example, one of the factors asks us to take into account the "religious" or "secular" nature of a particular product or service. *See LeBoon*, 503 F.3d at 226. The Supreme Court, however, has repeatedly cautioned courts against venturing into this constitutional minefield.

In *Amos*, the Court found exactly this sort of inquiry problematic in the context of determining whether a particular employee's duties were religious or secular. There, the lower court had held that a "building engineer" at a church gymnasium performed a secular activity. 483 U.S. at 332. The Supreme Court reversed, explaining that to force an organization to "predict which of its activities a secular court will consider religious," would impose a "significant burden" and "might affect the way an organization carried out what it understood to be its religious mission." *Id.* at 336. As Justice Brennan wrote in concurrence,

> determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs. Furthermore, this prospect of government intrusion raises concern that a religious organization may be chilled in its free exercise activity. While a church may regard the conduct of certain functions as integral to its mission, a court may disagree.

*Id.* at 343-44 (Brennan, J., concurring) (internal citation omitted). If we should not be in the business of determining whether a particular "activity" is religious or secular, our competence to make that determination with respect to a particular "product" or "service" is in serious doubt.

Similarly, in *New York v. Cathedral Academy*, 434 U.S. 125 (1977), the Court struck down a law which authorized reimbursement payments to nonpublic schools for certain "testing services required by state law." *Id.* at 127. The Court held that the law created a Catch-22: it either impermissibly advanced religion by providing support for testing which furthered religion, or it resulted in excessive entanglement with religion as the government attempted to sort out religious and nonreligious activities. *Id.* at 132-33. As to the latter, the Court remarked that "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."[7] *Id.* at 133.

---

[7]It is true that courts sometimes must decide whether a statute has the purpose of advancing or inhibiting religion. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002); *Stone v. Graham*, 449 U.S. 39, 40-41 (1980). This inquiry, however, only asks courts to interpret *statutes*, not whether particular practices have religious meaning. Likewise, courts are certainly competent to decide whether an individual's religious beliefs are sincerely held. *See Hernandez v. Comm'r*, 490 U.S. 680, 693 (1989). This determination focuses on the credibility of the individual's testimony, not on the religious or nonreligious nature of his actions. Thus, there is no merit to the dissent's assertion that courts adjudicating constitutional claims evaluate an individual's actions to "distinguish[ ] between the religious and the secular." Dissent at 1465.

In the case at hand, however, we have repeatedly been asked to engage in exactly this sort of inquiry into "what does or does not have religious meaning." For example, World Vision contends that its humanitarian relief efforts have religious meaning; the Employees claim they do not. If we were to apply this prong of the *LeBoon* test to the case at hand, we would at least implicitly have to answer to that question. The very act of making that determination, however, runs counter to the "core of the constitutional guarantee against religious establishment." *Cathedral Acad.*, 434 U.S. at 133; *see also Catholic Bishop*, 440 U.S. at 502 (noting that, when inquiring into whether a particular position was religious or secular, "[i]t is not only the conclusions that may be reached by the [government agency] which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions*" (emphasis added)); *cf. Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("[I]nquiry into . . . religious views . . . is not only unnecessary but also offensive. It is well established . . . that courts should refrain from trolling though a person's or institution's religious beliefs.").

Section 2000e-1's statutory history suggests that we are not the only governmental entity to recognize the dangers of this particular inquiry. An earlier version of the statute extended the exemption merely to the "religious activities" of covered organizations. *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241, 255 (stating that Title VII did not apply "to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society *of its religious activities*" (emphasis added)). Congress amended the statute, however, to remove the limiting reference to "religious activities." *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 3, 86 Stat. 103, 104.

On a related note, *LeBoon* asks us to determine whether an organization's founding purpose is religious or secular in nature. *See LeBoon*, 503 F.3d at 226. For all the reasons discussed above, where the nature of an organization's purpose is disputed, this factor is a second invitation to wander into the constitutional briar patch of distinguishing between the sacred and the secular. If we are ill-equipped to determine whether an activity or service is religious or secular in nature, how are we to know which side of the line an entity's "purpose" falls on?[8]

c

The factor which would have us ask whether an organization is affiliated with or supported by a "formally religious" entity is no less problematic. *See LeBoon*, 503 F.3d at 226; *Kamehameha*, 990 F.2d at 461. In the first place, this inquiry begs the question: it gives no means by which to determine whether the parent organization is religious. While that answer is obvious when dealing with, for example, a Catholic hospital, it would not be so straightforward when the parent entity is less obviously religious.

Moreover, this consideration contains the potential for discrimination amongst religious institutions. In short, a constrained reading of this factor favors institutions which claim a denominational affiliation over those who do not.[9] As the

[8]The same is true for factors which ask this court to determine whether an organization includes "prayer" or "worship" in its activities, or whether it disseminates a "religious" curriculum. While these questions are relatively easy in some contexts, they might prove more difficult when dealing with religions whose practices do not fit nicely into traditional categories. In such a scenario, it is questionable whether a court is competent to distinguish religious speech (or instruction) from other activities. *Cf. Widmar v. Vincent*, 454 U.S. 263, 269 n.6 (1981) (noting, in a free speech case, that a distinction between particular types of religious speech would lack "intelligible content").

[9]This consideration would cut against entities formed by an appreciable portion of the population. According to a 2000 Harris poll, non-

United States argues as amicus curiae, "[t]o deny World Vision the protection of section 2000e-1(a) also could raise serious constitutional questions by discriminating in favor of houses of worship and against independent, 'parachurch' groups like World Vision, which are organized for religious purposes and have religious tenets, but are not affiliated with any particular congregation or sect." *See also Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1259 (refusing to discriminate between "types" of religious institutions); *Great Falls*, 278 F.3d at 1346 (same).

d

The Supreme Court's decision in *Larson* is instructive. In that case, the Court struck down "a Minnesota[ ] statute imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty percent of their funds from nonmembers." 456 U.S. at 230. The Court observed that such law made "explicit and deliberate distinctions between different religious organizations." *Id.* at 246 n.23. It

> effectively distinguishe[d] between well-established churches that have achieved strong but not total financial support from their members, on the one hand, and churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members, on the other hand.

*Id.* (internal quotation marks omitted). Such preferences were unconstitutional unless justified by compelling governmental interests. *Id.* at 246-47.

---

denominational Protestants make up 7.7 percent of the U.S. population. *See Largest Religious Groups in the USA, http://www.adherents.com/rel_ USA.html#families* (last visited Aug. 12, 2010).

Thus, weighing the religious or irreligious nature of funding sources could pose similarly troublesome difficulties involving "distinctions between different religious organizations." As was the case in *Larson*, looking to whether an entity is "financially supported" by a formally religious entity could effectively discriminate between "well-established" organizations, who have weaned themselves of revenue from their "mother" church, and those "which are new" and still dependent on their parent organization. In the same way, such inquiry could discriminate between organizations which "favor public solicitation over general reliance on financial support" from other religious institutions.[10]

**[8]** In spite of these attendant constitutional concerns, both *Townley* and *Kamehameha* relied on characterizations of whether certain attributes of a organization were secular or religious in nature. *See Kamehameha*, 990 F.2d at 461-63; *Townley*, 859 F.2d at 619. Those characterizations, however, were not our own. In *Townley*, the secular nature of the company's product was "admitted[ ]." 859 F.2d at 619. Likewise, *Kamehameha* contains no indication that the religious or secular nature of any particular activity or purpose was in dispute.[11] *See* 990 F.2d at 461-64. Obviously, if there is no controversy regarding a religious or secular classification, the constitutional concerns detailed above are not implicated. Thus, where there is no dispute that a particular activity or purpose is religious in nature, we may rely on the parties' characterization. In a case such as this, where the matter is hotly con-

---

[10]Making a finding of religiosity contingent on receipt of support from coreligionists could also raise constitutional issues in that it might burden a religious institution's ability to raise revenue. For example, an entity in need of funds might be hesitant to solicit donations from secular sources if such solicitation would deny it section 2000e-1 eligibility.

[11]We did remark that the "[s]chools' purpose and character is primarily secular, not primarily religious." *Kamehameha*, 990 F.2d at 464. We reached this conclusion by assessing whether the quantum of *admittedly* religious activity at the schools was sufficient to demonstrate that the schools' purpose was primarily secular. We did not assess whether any particular activity was religious in nature. *See id.* at 461-63.

tested, however, we should stay our hand and rely on considerations that do not require us to engage in constitutionally precarious inquires. *See LeBoon*, 503 F.3d at 230 (citing entanglement concerns as a reason for declining to decide whether an activity was religious or cultural).

e

**[9]** As for the affiliation factor, to the extent we are required to consider it, we are disinclined to afford it much weight in light of potential it presents for discrimination amongst religious institutions.[12] The fact that prior organizations found eligible for section 2000e-1 relief have generally been "wholly or partially owned by a church," *Kamehameha*, 990 F.2d at 461 n.7, does not mean that we should deny relief to equally religious organizations that are not similarly affiliated.

III

A

Although Judge Kleinfeld and I agree on the forgoing principles and on the result in this case, we disagree as to the proper test for distinguishing religious entities entitled to the section 2000e-1 exemption from those entities not entitled to the exemption.

In my view, where the religious or nonreligious nature of a particular activity or purpose is in dispute, we should not rely exclusively on *LeBoon*'s hodgepodge of constitutionally questionable inquiries. Rather, I believe the better approach can be summarized as follows: a nonprofit entity[13] qualifies

---

[12]Again, neither *Townley*, *Kamehameha*, nor *LeBoon* give any advice on how we are to weigh the various factors, except to say that their significance could vary from case to case. *See LeBoon*, 503 F.3d at 227.

[13]In *Amos*, the Supreme Court expressly left open the question of whether a for-profit entity could ever qualify for a Title VII exemption. 483 U.S. at 349 (O'Connor, J., concurring).

for the section 2000e-1 exemption if it establishes that it 1) is organized for a self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious. *See Great Falls*, 278 F.3d at 1343; *Universidad Cent. de Bayamon v. NLRB*, 793 F.2d 383, 399-400, 403 (1st Cir. 1985) (en banc) (Breyer, J.).

This analysis minimizes any untoward differentiation among religious organizations and any unseemly judicial inquiry into whether an activity is religious or secular in nature. First and foremost, it centers on neutral factors (i.e., whether an entity is a nonprofit and whether it holds itself out as religious). Rather than forcing courts to "troll[ ] through the beliefs of [an organization], making determinations about its religious mission," *Great Falls*, 278 F.3d at 1342, it permits an institution to acknowledge its own religiosity. The furtherance prong likewise avoids any untoward judicial inquiry; all we must do is evaluate the purpose provided by the organization against the organization's practice.

The initial consideration, whether the entity is a nonprofit, is especially significant. Because "persons having a personal and private interest in the activities of [a nonprofit] organization" may not receive any portion of its net earnings, 26 C.F.R. § 1.501(a)-1(c); *see id.* § 1.501(c)(3)-1(c)(2), an organization's status as a nonprofit bolsters a claim that its purpose is nonpecuniary. It is true that a "nonprofit" may make a "profit"— at least in the sense that it may have net earnings because its revenues exceed its costs. But, a nonprofit entity is distinguished from a for-profit entity by what it does with its net earnings. A nonprofit entity must spend any net earnings to advance its tax-exempt purpose, and may not distribute its net earnings to its principals as dividends, bonuses, or excessively high salaries. *See* 26 U.S.C. § 501(c)(3) (stating that an organization qualifies as a nonprofit if "no part of the net earnings of [the organization] inures to the benefit of any

private shareholder or individual"); *see also* 26 C.F.R.
§ 1.501(c)(3)-1(b)(4). This is not to say that a nonprofit orga-
nization may not compensate its employees at a market rate.
*See* 26 C.F.R. § 1.501(c)(3)-1(f)(2)(ii) (stating that the IRS
may revoke an organization's nonprofit status for providing
its employees disproportionate compensation for their ser-
vices). Just as a nonprofit hospital may pay $5 million for a
new MRI machine that costs $5 million, it may pay $400,000
a year to hire a radiologist when the going rate for a radiolo-
gist is $400,000 a year. *See id.*

Because a nonprofit may not distribute its net earnings to
its organizers or employees, the fact that an entity is struc-
tured as a nonprofit provides strong evidence that its purpose
is purely nonpecuniary. As Justice Brennan observed in his
concurrence in *Amos*, "[t]he fact that an operation is not orga-
nized as a profit-making commercial enterprise makes color-
able a claim that it is not purely secular in orientation." *Amos*,
483 U.S. at 344 (Brennan, J., concurring).[14] Indeed, "nonprof-
its historically have been organized specifically to provide
certain community services, not simply to engage in com-
merce." *Id.* "[P]rovision of such services [is often regarded]
as a means of fulfilling religious duty and providing an exam-
ple of the way of life a [religion] seeks to foster." *Id.* These
realities bolster a "contention that an entity is not operated
simply in order to generate revenues . . . , but that the activi-
ties themselves are infused with a religious purpose." *Id.*

The test I propose also ensures that the section 2000e-1
exemption will remain "narrow[ ]." *Kamehameha*, 990 F.2d at
460. Requiring that an organization hold itself out as religious
"helps to ensure that only *bona fide* religious institutions are
exempted." *Great Falls*, 278 F.3d at 1344. "[S]uch public rep-
resentations serve as a market check. While public religious

---

[14]Justice Brennan would have gone so far as to impose a "categorical
exemption for nonprofit activities." *Amos*, 483 U.S. at 345 (Brennan, J.,
concurring).

identification will no doubt attract some [people] to the institution, it will dissuade others. In other words, it comes at a cost. Such market responses will act as a check on institutions that falsely identify themselves as religious merely to obtain [the benefit of the section 2000e-1] exemption . . . ." *Id.*

B

Having set forth what I believe to be the appropriate test to determine whether an organization qualifies for the section 2000e-1 exemption, I now apply it to the facts of this case.

1

I first note that World Vision operates as a nonprofit entity. *See Townley*, 859 F.2d at 619; *see also LeBoon*, 503 F.3d at 226; *Killinger*, 113 F.3d at 199. The Employees make much of the fact that World Vision is a "billion-dollar-per year" business whose leaders receive six-figure salaries. They highlight the contrast between the large, international humanitarian relief organization that is World Vision, and the local Jewish community center in *LeBoon*, which served only a "discrete religious community."

In essence, the Employees ask this court to penalize World Vision for doing "too much" humanitarian work. They do not explain how the scope of World Vision's operations changes the undisputed fact that World Vision is a nonprofit entity which the IRS has classified as a 501(c)(3) tax-exempt organization. *Cf. Townley*, 859 F.2d at 619 (noting that the company's for-profit status weighed against section 2000e-1 coverage). I am satisfied that World Vision's nonprofit status "makes colorable [World Vision's] claim that it is not purely secular in orientation." *Amos*, 483 U.S. at 344 (Brennan, J., concurring).

2

I next assess whether World Vision is organized for a self-identified religious purpose. *See LeBoon*, 503 F.3d at 226; *Kamehameha*, 990 F.2d at 462; *Townley*, 859 F.2d at 619; *cf. LeBoon*, 503 F.3d at 226-27 ("It is apparent from the start that the decision whether an organization is 'religious' for purposes of the exemption cannot be based on its conformity to some preconceived notion of what a religious organization should do, but must be measured with reference to the particular religion identified by the organization."). Even a cursory review of World Vision's Articles of Incorporation, bylaws, core values, and mission statement reveal explicit and overt references to a religious purpose.[15]

World Vision's 1950 Articles of Incorporation, state that the "primary business" of the organization "is to conduct Christian religious missionary services, to assist in improving and ameliorating the moral and social conditions of humanity, [and] to provide services to God's people which will enable them to accomplish more quickly and efficiently the Great Commission of advancing the Kingdom of God on earth." As amended in 1980, the Articles read:

> The primary exclusive and only purposes for which this corporation is organized are religious ones . . . including . . . to conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nurture and spread of the Christian religion and to render Christian service, both material and spiritual to the sick, the aged, the homeless and the needy. The recital of these purposes . . . is intended to be exclusive of any and all

---

[15]For the reasons detailed above, I do not consider the Employees' argument that World Vision's stated mission is humanitarian, and thus secular in nature. *See supra* Part II.A.2.b.

other purposes, this corporation being formed for such religious purposes only.

Also included in the Articles is the commitment to "continually and steadfastly uphold and maintain the following statement of faith," which begins:

(a) We believe the Bible to be the inspired, the only infallible, authoritative Word of God.

(b) We believe that there is one God, eternally existent in three persons: Father, Son, and the Holy Spirit.

(c) We believe in the deity of our Lord Jesus Christ, in His virgin birth, in His sinless life, in His miracles, in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return.

This Statement of Faith is echoed in the organization's "Core Values,"[16] mission statement,[17] and "Core Characteristics."[18]

---

[16]Some relevant selections include the following:

We are Christian[:]

We acknowledge one God: Father, Son and Holy Spirit. In Jesus Christ the love, mercy and grace of God are made known to us and all people. From this overflowing abundance of God's love we find our call to ministry.

We proclaim together, "Jesus lived, died and rose again. Jesus is Lord." We desire him to be central in our individual and corporate lives.

We seek to follow him—in his identification with the poor, the afflicted, the oppressed, the marginalised; in his special concern for children; in his respect for the dignity bestowed by God on women equally with men; in his challenge to unjust attitudes and systems; in his call to share resources with each other; in his love

In *Kamehameha*, the instrument that established the schools, a will, did not provide that the schools' purpose was religious, only that "the teachers of said schools shall forever be persons of the Protestant religion." 990 F.2d at 459. After considering the entire record, we concluded that "the general picture of the [s]chools reflects a primarily secular rather than a primarily religious orientation." *Id.* at 461. We took note that the schools' public statements and curriculum had once emphasized their Protestant roots, but that by the 1990s, the schools' religious characteristics consisted of "minimal, largely comparative religious studies, scheduled prayers and services, quotation of Bible verses in a school publication, and the employment of nominally Protestant teachers for secular subjects." *Id.* at 462-63. By contrast, World Vision's organizing principles were religious, it has always presented itself as a religious institution, and it continues to do so. Thus, I have no trouble concluding that unlike the private schools in *Kamehameha* or the business in *Townley*, World Vision is organized for an avowedly religious purpose.

3

Having established that World Vision's organizing principles are avowedly religious, I examine whether the organization is engaged in activity consistent with, and in furtherance of, those purposes. The Employees claim that, like the schools in *Kamehameha*, the World Vision's activities are no longer in line with its stated purposes. *See Kamehameha*, 990 F.2d

---

for all people without discrimination or conditions; in his offer of new life through faith in him. From him we derive our holistic understanding of the gospel of the kingdom of God, which forms the basis of our response to human need.

[17]World Vision's self-stated "Mission," and "day-to-day reason for being" is "[t]o call people to a life-changing commitment to serve the poor in the name of Christ."

[18]These "Core Characteristics" are designed to provide staff guidance. Each characteristic is linked to a particular verse from the Bible.

at 462. To that end, the Employees place emphasis on the fact that World Vision does not condition receipt of its services on religious belief.

In practical terms, World Vison's profession that it is "dedicated to serving God by serving man" plays itself out through "six basic ministries": "1) caring for children in need, 2) building self reliance among the needy, 3) emergency aid and relief, 4) evangelism, 5) strengthening Christian leadership and 6) educating Americans about the needs of the suffering around the world." Among other things, World Vision provides disaster relief services, assists in combating the spread of HIV/AIDS, and runs programs which pair at-risk children and teens with mentors from their community. The organization also reaches out to American churches to raise awareness about humanitarian needs around the globe.

To the general public, World Vision is perhaps best known for its child sponsorship program. Donors are paired with particular children and their contributions provide access to clean water, food, health care, education, vocational training, and—for those children who are interested—the opportunity to learn about the Christian faith.

The last caveat reflects the fact that World Vision does not proselytize. Its services are made available to people of all faiths or of no faith. Indeed, World Vision claims that to do otherwise "would be contrary to its theology." Instead, the organization explains that it attempts to express its "Christian witness . . . in holistic ways through . . . ministries of relief, development, advocacy and public awareness." Humanitarian services are thus provided without strings attached, though World Vision operates numerous religious programs for those who express interest.

This review of undisputed evidence in the record readily shows that World Vision continues to conform to its founding documents, conducting "Christian religious and missionary

services" and "render[ing] Christian service, both material and spiritual to the sick, the aged, the homeless and the needy." Indeed, that is essentially all World Vision appears to do. Such continued devotion to the organization's founding aims stands in stark contrast to the situation in *Kamehameha*, where "the purpose and emphasis of the [s]chools ha[d] shifted over the years from providing religious instruction to equipping students with ethical principles." 990 F.2d at 462.

I am not persuaded by the Employees' claim that World Vision is acting inconsistently with its mission because it does not confine its relief efforts to coreligionists. According to World Vision, providing humanitarian aid to all in need, regardless of religious belief, is a tenet of its faith. *See supra* pp. 12548-49. The Employees thus ask us to require World Vision to act contrary to such belief in order to qualify for the exemption. The plaintiff in *LeBoon* raised a similar argument, which the Third Circuit properly discounted.

> We disagree with LeBoon's contention that the [community center's] willingness to welcome Gentile members and even to host Hindu services is incompatible with the view that the [center] was a religious organization. Indeed, these characteristics are clearly tied to some of the Jewish principles that guided the [center] . . . . We will not deprive the [center] of the protection of [section 2000e-1] because it sought to abide by its principles . . . through extending its welcome to non-Jews.

*LeBoon*, 503 F.3d at 230. I agree with the D.C. Circuit that to confine an exemption "to religious institutions with hardnosed proselytizing, that limit their enrollment to members of their religion . . . is an unnecessarily stunted view of the law." *Great Falls*, 278 F.3d at 1346 (citing *Larson*, 456 U.S. at 244)).[19]

---

[19]Not to mention that this would again raise considerations of discrimination among religious institutions: here, between groups that engage in "hard nosed proselytizing" and those that do not. *See supra* Part II.A.2.b.

Moreover, the Employees' argument would lead to absurd results. Hosts of religious organizations—including such obviously religious entities as churches or synagogues—open their doors to all. They provide religious instruction, counseling, prayer, and a variety of other services without concern for whether the individual requesting such services is a coreligionist. Adopting the Employees' standard compels the conclusion that this inclusivity cuts against an entity's ability to qualify for the section 2000e-1 exemption. Thus, the fact that World Vision provides its services without condition does not suggest it is ineligible for the exemption.

4

I next ask whether World Vision holds itself out to the public as a religious organization. Even the Employees concede this point. They could do little else. World Vision makes no effort to disguise its Christian nature.

At the most basic level, World Vision's logo is a stylized Christian cross, and religious artwork and texts are displayed throughout the organization's campus. Much more significantly, World Vision disseminates Christian Messaging Guidelines within the organization to "guide" "[e]xternal communications." The Guidelines state that World Vision "is intentional about communicating [its] Christian faith accurately and with integrity": "[i]n a world where many institutions have moved away from their Christian roots, [World Vision] remain[s] committed to living out [its] faith through [its] work." The organization requires that "[a]t a minimum, World Vision's descriptor statement must be on every piece of communication."[20] Furthermore, "World Vision always

---

[20]The following is an example of the "descriptor statement":

World Vision is a Christian humanitarian organization dedicated to working with children, families, and their communities worldwide to reach their full potential by tackling the causes of poverty and injustice. Motivated by our faith in Jesus Christ, we serve along side the poor and oppressed as a demonstration of God's unconditional love for all people. World Vision serves all people, regardless of religion, race, ethnicity or gender.

identifies itself as a Christian organization." In reviewing external communications, employees are to ask themselves, "Would anyone who read this know that World Vision is a Christian organization?" They are also instructed: "[Conveying the organization's Christian nature is] NOT AN ADD-ON. Because we demonstrate our faith through life, deed, word, and sign, our Christian witness is integrated into all that we do. Christian witness should be communicated as part of everything World Vision does."

This overt Christianity is especially evident to those applying for employment at World Vision. For example, the following appears on the World Vision's "Careers" webpage:

Who we are:

Motivated by our faith in Jesus, we serve the poor as a demonstration of God's unconditional love for all people. Our faith is at the heart of all we do. Foundational to our work is the commitment to a shared faith by staff, volunteers and interns, and a common understanding of how that faith is lived out day-to-day.

Who you are:

You are a committed Christian eager to put your faith into action every day as you use your life to make a tangible difference for children in need. You recognize the importance of working together with diverse partners—including individuals, churches, corporations, and governments—to help build a better world in which all people are free from oppression, where peace and justice flourish, and where the most vulnerable live in confidence.

You are an experienced, results-oriented professional excited at the prospect of using the unique gifts and

talents God has given you to help children and families in need. World Vision U.S. hires only those who agree to and accept its Statement of Faith and/or the Apostles' Creed.[21]

All employees who are offered positions with the organization are presented an offer letter containing the text of Romans 8:28 ("And we know that God causes all things to work together for good to those who love God, to those who are called according to HIS purpose."). While prospective employees are not required to belong to a particular Christian denomination, applicants are specifically requested to describe their "relationship with Jesus Christ." They are also informed that employment is contingent upon "agreement and compliance with" World Vision's Statement of Faith and/or the Apostles' Creed, as well as World Vision's Core Values and Mission Statement. The prospective employee must acknowledge that she has "received, read, and discussed the[se] documents, and . . . subscribe[s], wholeheartedly, to the principles inherent therein."

In a case such as this, where an organization "holds itself out publically as a religious institution, '[w]e cannot doubt that [it] sincerely holds this view.' " *Great Falls*, 278 F.3d at 1344 (alterations in original) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000)).

---

[21]The Apostles' Creed, as it appears on World Vision's website, reads as follows:

> I believe in God, the Father almighty, creator of heaven and earth. I believe in Jesus Christ, God's only Son, our Lord, who was conceived by the Holy Spirit, born of the Virgin Mary, suffered under Pontius Pilate, was crucified, died, and was buried; he descended to the dead. On the third day he rose again; he ascended into heaven, he is seated at the right hand of the Father, and he will come again to judge the living and the dead. I believe in the Holy Spirit, the holy catholic church, the communion of saints, the forgiveness of sins, the resurrection of the body, and the life everlasting. AMEN.

5

I reluctantly comment on the fact that World Vision is not associated with any particular church or denomination and no representative of such an entity serves on World Vision's board of directors and only do so because our precedent compels such an inquiry. The Employees contend that this lack of affiliation is fatal to World Vision's attempt to qualify for the section 2000e-1 exemption. *See LeBoon*, 503 F.3d at 226; *Kamehameha*, 990 F.2d at 461. Because, as explained above, such a conclusion would impermissibly discriminate amongst religious institutions, I cannot agree with this assertion. *See supra* Part II.A.2.b.

I also observe that in *LeBoon*, the Jewish community center at issue was neither wholly nor partially owned by a synagogue. Instead, the Third Circuit's affiliation analysis discussed the center's "close and active ties" with "three local synagogues," its reliance "on coreligionists for financial support," and its inclusion of three rabbis "in management decisions." *LeBoon*, 503 F.3d at 227-29.

Applying this analysis, there is ample evidence in the record to indicate that World Vision receives a large portion of its funding from coreligionists: both from individuals and from churches. World Vision solicits donations from the general public on its website for, inter alia, individual children, "Disaster Response," "Clothing for Children," "Africa Food Aid," "Hope for Sexually Exploited Girls," and "Seeds, Tools, and Training in Africa," While these individual web links do not necessarily make explicit reference to World Vision's religious nature, fundraising letters do contain descriptions of the organization's Christian character. In recent years, approximately eighty-four percent of World Vision's cash contributions have come from churches and coreligionists.

World Vision also "maintains close and active ties" with a host of "formally religious" institutions. Currently, ten members of its Board of Directors come from "church and ministry leadership," a category that "must" be represented. Moreover, it is undisputed that World Vision is affiliated with WVI, an organization classified as a "church" for tax purposes by the IRS.[22]

6

Because the Employees concede this point, I also find it appropriate briefly to note that World Vision includes prayer or other forms of worship in its activities. *LeBoon*, 503 F.3d at 226. This concession is also confirmed by overwhelming, undisputed evidence in the record.

According to World Vision, because it "believes the key to faithfully following Christ lies first in the hearts and minds of [its] staff and only then in program activities," religion pervades the workplace.[23] New employees participate in a two-day orientation which begins with daily devotionals and "focuses on serving Christ as the motivation for serving the poor." Through the "Faith@Work" program, World Vision employees are "strongly encouraged" to attend weekly chapel services; daily devotional activities are held within each department; prayer requests are circulated amongst coworkers; Biblical "themes" are emphasized annually, quar-

---

[22]Plaintiffs also make much of the fact that World Vision receives approximately twenty-five percent of its funds from federal grants. Apart from conclusory allegations, however, they do not explain how receipt of government funds undermines World Vision's religiosity or bars its classification as a religious entity.

[23]World Vision's website describes the workplace environment as follows: "World Vision is a community of Christians who are committed to serve the poor in the name of Christ. The staff at our U.S. headquarters represent more than 38 different Christian denominations. Our common purpose and love for Jesus Christ creates a friendly, supportive environment."

terly, and monthly; and an entire work day is set aside each year for prayer.[24]

## C

Based on the foregoing consideration of "[a]ll significant religious and secular characteristics," I am satisfied that World Vision has met its burden of showing that the "general picture" of the organization is "primarily religious." World Vision is a nonprofit organization whose humanitarian relief efforts flow from a profound sense of religious mission. That mission is evinced in the organization's founding documents. Significantly, World Vision continues to act in accordance with those documents, and it explicitly and intentionally holds itself out to the public as a religious institution. While World Vision is neither owned by nor affiliated with a formally religious entity in the traditional sense, this does not preclude our finding that it is a "primarily religious" organization and thus eligible for the section 2000e-1 exemption.

---

KLEINFELD, Circuit Judge, concurring:

All three of us agree that a multifactor test does not work well because it is inherently too indeterminate and subjective, but we disagree on what the test ought to be. I write separately because, although I agree with Judge O'Scannlain that we should affirm, I disagree with both my colleagues' formulations of the test to be applied. I concur in Parts I and II of Judge O'Scannlain's concurrence.

---

[24]It is true, as Plaintiffs note, that the fact that the employees in *Townley* were required to attend devotional services did not preclude this court from finding the entity secular in nature. 859 F.2d at 619. The inquiry, however, is multifaceted. While the company in *Townley* conducted devotional services, it was also a for-profit manufacturer of an "admittedly secular product": mining equipment. *Id.*

The Civil Rights Act of 1964 generally prohibits discrimination based on religion, but exempts religious institutions:

> This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.[1]

Our task is to decide whether World Vision is a "religious corporation, association, educational institution, or society."

Judge O'Scannlain formulates this test: "a nonprofit entity qualifies for the section 2000e-1 exemption if it establishes that it 1) is organized for a self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious." Judge Berzon formulates this one: "Congress used the terms 'religious corporation, association . . . or society' . . . to describe a church or other group organized for worship, religious study, or the dissemination of religious doctrine." I agree with Judge O'Scannlain that World Vision falls within the statutory exemption, but in my view, his test is too inclusive, and Judge Berzon's is too exclusive.

The Civil Rights Act and the exemption are not mere words. They are designed to accomplish something, they have purposes, and the words cannot be understood without considering the purposes. Purposes are not the same thing as legislative history, often merely a depositary for lobbyists' requests that did not make it into the statute.[2] The Civil Rights Act of 1964 is intended to free us from the curse of discrimination

---

[1] 42 U.S.C. § 2000e-1(a).

[2] *See Puerta v. United States*, 121 F.3d 1338, 1344 (9th Cir. 1997).

in hiring by "race, color, religion, sex, or national origin."[3] But without an exemption for religious institutions, that Act would have the unintended consequence of preventing the free exercise of religion.[4] If the government coerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions. Judge O'Scannlain's test would facilitate free exercise of religion, but would also allow people to advance discriminatory objectives outside the context of religious exercise by means of mere corporate paperwork. Judge Berzon's would limit religious exercise to worship, study, and dissemination, and deny people the freedom to employ only people who share their religion for their other religious activities. If an interpretation disserves the evident purposes of the Civil Rights Act and the religious institution exemption, then it is probably mistaken.

Judge Berzon's reading purports to be a *noscitur a sociis* construction, but ignores the phrase "educational institution." The justification she gives is that World Vision is not an educational institution, but the phrase cannot be ignored if we are to use *noscitur a sociis* as an interpretive aid. The statute does not say "religious corporation, association, or society." It says "religious corporation, association, educational institution, or society." Congress quite plainly, by including "educational institution" in the exemption, expressed a purpose of exempt-

---

[3]42 U.S.C. § 2000e-2(a).

[4]*See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327, 335-36 (1987); *Little v. Wuerl*, 929 F.2d 944, 949 (3d Cir. 1991); *cf. EEOC v. Pacific Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) (discussing potential Free Exercise problems arising from the application of Title VII of the Civil Rights Act to religious organizations, but noting that Congress only exempted religious organizations from the ban on religious discrimination, not other forms of discrimination), *abrogation on other grounds recognized by American Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991).

ing religious institutions that were not churches, not just those that were. *Noscitur a sociis* is an aid to construction useful for determining what Congress meant, though not a doctrine of law.[5] The Latin phrase means that "the meaning of doubtful words may be determined by reference to associated words and phrases."[6] Because "educational institution" is among the "associated words and phrases," it cannot be elided when using associated words and phrases to figure out what the ones at issue mean. And once considered, the phrase "educational institution" compels the conclusion that Congress did not limit the exemption to churches and synonyms for churches.

Judge Berzon's interpretation fails because, first, as explained above, we cannot determine the meaning by reference to associated words and phrases without considering *all* the associated words and phrases, and one of them, "educational institution," is not a synonym for "church," nor do church schools function merely as places of religious study or disseminators of religious doctrine. Typically most of the courses are secular. Teaching children the multiplication tables and *Silas Marner* is not religious study or dissemination of religious doctrine, yet that sort of thing is how most of the day is spent at parochial schools. Nor does "religious association" mean "church, temple, synagogue, or mosque," as Judge Berzon would have it. Had Congress meant to say that, it would have. Fair application of *noscitur a sociis* requires us to find something in common among all the associated words and phrases, not just some of them.

Second, Judge Berzon's approach ignores the additional canon, that all the words of the statute must be accorded some meaning, rather than treating some as superfluous. "It is an

---

[5]*See Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992).

[6]2A N. Singer & J. Singer, Sutherland Statutory Construction § 47:16 (7th ed. 2007); *see also United States v. Williams*, 553 U.S. 285, 294 (2008); *United States v. Belless*, 338 F.3d 1063, 1068 (9th Cir. 2003).

elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."[7] Indeed, Judge Berzon's construction would require us to ignore an entire statutory definition: "The term 'religion' includes *all* aspects of religious observance *and practice*,"[8] a definition irreconcilable with her proposition that it means basically what people do in church, worship, study, and disseminate religious doctrine to the congregation. Judge Berzon suggests that although the statute provides a definition of the noun form of the word "religion," that definition has no bearing on the meaning of the adjective "religious" in the same statute.

Third, Judge Berzon's narrowing of the exemption prevents the exemption from accomplishing its purpose, protecting the free exercise of religion. Since the earliest times in the Judeo-Christian tradition, religion has meant more than prayer,[9] and has even denigrated prayer where it is not connected with goodness toward one's fellow man.[10] Under Judge Berzon's reading, if several Protestant churches of various denominations organize an association to employ missionaries in the field, they can limit their hiring to Protestants only if the missionary work is limited to preaching. If the Protestant missionaries proselytize by example, showing rather than telling how to be a good Christian, then the Protestants have to hire atheists, Jews, and Catholics without discrimination to do their Protestant missionary work. Sometimes religious activity consists of being a "City upon a Hill." She would have the Protestant group avoid Title VII by claiming religion as a

---

[7]2A N. Singer & J. Singer, Sutherland Statutory Construction § 46:6 (7th ed. 2007) (quotation marks and citations omitted); *see also Exxon Corp. v. Hunt*, 475 U.S. 355, 369 (1986) (rejecting the reading of a phrase that made a latter phrase surplusage); *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003).

[8]42 U.S.C. § 2000e(j) (emphasis added).

[9]*See Matthew* 5:16.

[10]*See Isaiah* 1:15-17; *Isaiah* 58:3-8.

bona fide occupational requirement, but it is hard to see why it would be, since the activity is outside Judge Berzon's view of religion.

Judge Berzon's approach does not even accomplish the narrowing she evidently seeks, because it is not so easy to say just what "worship" is, what type of study qualifies as "religious study," or what counts as "dissemination of religious doctrine." Is the Catholic school still religious, in Judge Berzon's view, if the children learn reading, writing, and arithmetic? Was Father Damien's work caring for the lepers on Molokai religious?

Judge Berzon's narrow list of acceptable religious practices excludes numerous religious traditions. It is not clear whether she would accept as a religious association a traditional Inner Light Quaker "meeting" in a "meeting house," where "congregants worship in silence or speak only when they feel inwardly led to do so."[11] What about a Santeria shrine where chickens are sacrificed?[12] Is animal sacrifice worship? It was good enough for the Supreme Court in *Lukumi*, but appears not to fall within Judge Berzon's definition.

If only churches and the like are within the exemption, as she contends, the religious exemption would be limited to employees in the buildings where people sit, stand, and kneel as they recite traditional prayers and sing traditional hymns. Judge Berzon's interpretation of the exemption would better fit the mining equipment manufacturer in *EEOC v. Townley Engineering & Manufacturing Co.*,[13] than an "Inner Light"

---

[11]Isabel B. Terry, A Quaker Meeting and Mainstream Religion in a North Carolina Community, *in* DIVERSITIES OF GIFTS: FIELD STUDIES IN SOUTHERN RELIGION 23, 23, 26 (Ruel W. Tyson, James L. Peacock & Daniel W. Patterson, eds., 1988).

[12]*See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 524-25 (1993).

[13]859 F.2d 610, 612 (9th Cir. 1988).

tradition Quaker meeting, since the manufacturing plant held mandatory devotional services every week where everyone recited prayers.

As the government brief points out, under Judge Berzon's view, Mother Theresa's mission, performing humanitarian work, would be classed as secular, so if she were performing it in America, she would have to employ people who rejected the underlying religious premise of her enterprise hoping that despite their philosophical rejection, they would perform it faithfully to her ideals. On what principle can Judge Berzon concede, as she does, that Mother Theresa's work was religious, yet contend, as she does, that her organization could be religious only if it were limited to "worship, religious study, or the dissemination of religious doctrine." Since it was not, perhaps under Judge Berzon's view it would be appropriate to launch a class action against Mother Theresa's organization and similar ones if they engaged in religious discrimination in hiring or because of the severe and pervasive pressure of the religiosity of the workplace. Judge Berzon notes that "the Falun Gong, the Quakers, or Mother Theresa's mission should not be classed as secular solely because certain of their activities occur outside of a physical church."[14] Her adverb "solely" may imply that they should be classed as secular for that reason combined with others.

The core of Judge Berzon's dissent is the idea that performance of activities that are often performed in a secular context cannot be religious. That is mistaken. When the Pope washes feet on the Thursday before Easter, that is not secular hygiene, and the Pope is not a pedicurist. Confession to a priest and confession to a psychiatrist may have the same content, but that does not make confessing to a priest secular. Fitness clubs and Falun Gong both perform calisthenics. Religious missionaries and Peace Corps volunteers both perform humanitarian work, but only the latter is secular.

---

[14]Berzon dissent at 1453 n.5.

Humanitarian work may be a secular or a religious activity, depending on motivation and meaning among those who perform it.

Judge O'Scannlain's test errs because of its focus on nonprofit corporate organization. Some people worship in assemblies in each others' homes or borrowed conference rooms, with no corporate apparatus. Particularly when the congregations are small, such as a few Jews, Quakers, or Unitarians in a small town, they may not incorporate, and they may on some occasion employ a number of students to run a religious summer camp to instill their religion in their children, yet the exemption under Judge O'Scannlain's definition would not enable them to limit hiring to coreligionists. Absence of corporate papers and nonprofit status would defeat the exemption under his test, if nonprofit corporate and tax status is a sine qua non.

The narrowness problem may be repairable by a tweak in the test, but the overbreadth problem is not. Judge O'Scannlain's test is too broad because it would allow nonprofit institutions with church affiliations to use their affiliations as a cover for religious discrimination in secular employment. Judge Berzon is correct that under Judge O'Scannlain's test, the mining equipment company in *Townley* could discriminate by religion simply by incorporating itself as a nonprofit and getting 501(c)(3) status.

There is not much congruence between nonprofit status and the free exercise of religion, or any eleemosynary purpose. Any enterprise can be operated as a 501(c)(3) nonprofit if its stated purpose is "religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals."[15] The Townley Manufacturing Company

---

[15] 26 U.S.C. § 501(c)(3) ("Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable,

could, if it chose, be organized for a self-identified religious purpose as a nonprofit as evidenced by its articles of incorporation, engage in its regular religious devotions, and hold itself out as a Christian mining equipment manufacturer, satisfying Judge O'Scannlain's test. Nonprofit status would require that it pay out the surplus of revenue over other expenses as salaries instead of as dividends, but most closely held corporations do that anyway. Nonprofit status affects corporate governance, not eleemosynary activities. We lawyers organize corporations as nonprofits when a tax exemption is sought, or so that board members can pick their successors and avoid the need to repurchase stock from surviving spouses after the deaths of the principals. "For profit" and "nonprofit" have nothing to do with making money. As the CEO of National Geographic said, "[n]onprofit means non-taxable—it doesn't mean you don't make a profit."[16]

For example, physicians may organize a hospital as a nonprofit affiliated with a church, stating a religious purpose of healing the sick in its articles and bylaws. The hospital may then charge full market prices to patients and their insurers, and pay the physicians who organized it and their employees

─────────────

scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.").

[16]Chantelle Wallace, News Release, *National Geographic CEO Says Nonprofit's Mission is Bringing the World to Readers*, University of Texas at Austin, McCombs School of Business, April 11, 2007, available at *http://www.mccombs.utexas.edu/news/pressreleases/fahey07.asp* (last visited July 27, 2010).

around $50,000 a year for residents, $200,000 a year for employed physicians working a week on, week off, and $400,000 a year for radiologists. It can defend its stated religious purpose with the true argument that whatever church it affiliates with promotes healing the sick as a religious duty. Yet the nonprofit hospital differs from a for-profit hospital only in that the board does not have to concern itself with pesky stockholders and does not have to pay income taxes on the excess of revenues over expenses and depreciation. The free exercise concern protected by the exemption does not suggest that the hospital should be allowed to discriminate by religion in hiring, since physicians, nurses, and other employees can perform their tasks equally well regardless of their religious beliefs.

I offer this hypothetical not only because it illustrates the overbreadth of Judge O'Scannlain's test, but also because hospitals do indeed have a history of religious discrimination. Hospitals used to avoid hiring Jews for residencies, a major reason why Jewish hospitals were created in the United States.[17] That is not likely to occur now, but if the exemption applies, then hiring committees could discriminate according to whatever personal prejudices hiring physicians might have. The purpose of religious discrimination might not be to advance a religious objective in the practice of medicine, but rather to indulge bigotry against Jews, Catholics, Mormons, Seventh Day Adventists, fundamentalist Protestants, or others. There is no reason to extend the exemption to such an institution.

We can arrive at a usable modification of Judge O'Scannlain's test by considering the difference between the

[17]Arthur Hertzberg, THE JEWS IN AMERICA 234 (2d ed. 1997); Laura E. Weber, *"Gentiles Preferred": Minneapolis Jews and Employment, 1920-1950*, 56 Minn. Hist. 166, 170 (1991); Robert Katz, *Continuing Their Mission, Jewish Hospitals Reinvest in Philanthropy*, Forward, June 27, 2008, available at *http://www.forward.com/articles/13591/*; Dr. Barron H. Lerner, *In a Time of Quotas, a Quiet Pose of Defiance*, N.Y. Times, May 26, 2009, at D5.

hypothetical hospital and the Salvation Army. They both render services to people of different or no religions. Both are organized as nonprofits with express religious purposes. Both get charitable contributions. The Salvation Army really is intended to perform a Christian mission for religious purposes, and the hospital is not, having as its real objective the performance of medical services to serve the body and not the soul. But it is not practical for courts to look into the hearts of the Salvation Army executives and the hospital executives and make a judgment about their real purposes. There is one big objectively ascertainable difference: how they charge. The hospital gets money by exchanging valuable services for their market value in cash. The Salvation Army gives its homeless shelter and soup kitchen services away, or charges nominal fees, perhaps eight dollars a night for a bed worth fifty dollars a night.

Likewise, World Vision ministers to people to serve a religious purpose. Many churches are too small to do this themselves, and have to group together with other small, impecunious churches to do their mission and service work, so World Vision is an association but not a church. The evidence makes it quite clear that the idea is not merely foreign aid in poor countries, but what amounts to missionary work by making its service providers exemplars of Christian charity. World Vision is like the hypothetical missionary enterprise of a group of Protestant churches of various denominations described earlier, except that they show by example, rather than by express proselytizing, that theirs is a good religion. No doubt many of its beneficiaries will become Christians, just as Sokka Gakkai assisted by church groups in their transitions to American life sometimes become firm adherents of the churches that have helped them.[18] A mission-

---

[18]*See* Yutaka Yamada, *Like My Husband's Shadow: The Religious Experience of a Japanese Warbride in North Carolina*, *in* DIVERSITIES OF GIFTS: FIELD STUDIES IN SOUTHERN RELIGION 177, 177-78 (Ruel W. Tyson, James L. Peacock & Daniel W. Patterson, eds., 1988).

ary does not necessarily have to make people sing hymns for their supper to persuade his beneficiaries of the goodness of the tenets of his religion.

And unlike the hypothetical hospital, World Vision does not charge its beneficiaries the market value of its services. So far as we can tell from the record, it does not charge them at all. Looking at how an institution charges offers an objective test for sorting out which institutions are designed to exchange goods or services for money, from those designed to give them away except perhaps for nominal charges in order to serve a religious objective. This objective measure relates closely to the purpose of the exemption. We can tell much about an institution's purpose by looking at the objective evidence of how it charges. A religious purpose may be a motive, or money may be a motive, for work that serves others. If money is not available as an incentive, that is strong evidence, in the purportedly religious institution, that exercise of religion is the objective. If satisfaction of a religious purpose is insufficient to motivate the performance, then the performance may be consistent with religion but not motivated by it. There is nothing wrong with money as an incentive, but its presence or absence is strong evidence of what the incentive is.[19]

This discussion does not cover educational institutions, and religious schools may charge market rates as tuition. But they have their own phrase in the exemption, "educational institution," so they do not have to fall within the harder to define

---

[19]Judge Berzon seems to suggest that if Townley had organized a separate religious entity that did not sell mining equipment, just engaged in unquestionably religious activity, it would be wrong to allow the Townley Mining Company Church to restrict hiring to coreligionists, because it might "have a business impact, by reflecting positively on the profit-making company's corporate image." By that reasoning, if a Jewish congregation has a plaque in the temple honoring a business donor for its contribution, then the congregation cannot discriminate in its hiring because the congregation reflects positively on the donor.

phrases in the exemption for "religious corporation, association, educational institution, or society." The inclusion of educational institutions suggests a more sensible *noscitur a sociis* reading of the exemption for "religious corporation, association, educational institution, or society." What they all have in common is that they are means by which people engage in the free exercise of their religions. Many religions have as central requirements that their adherents teach the religions to their children.[20] Religious schools are how they do it, but they are often too expensive to operate supported out of charitable contributions, and need substantial tuitions. For the others, to determine whether the associations are religious or not for purposes of the exemption, what they charge for their services is an appropriate and usable test. For that matter, even if some educational institutions might otherwise be viewed as too secular in what they actually teach to qualify for the exemption, they would nevertheless be allowed by Congress to discriminate in hiring and employment by the alternative provision for schools "in whole or substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society."[21]

Accordingly, I would reformulate Judge O'Scannlain's test as this: To determine whether an entity is a "religious corporation, association, or society," determine whether it is organized for a religious purpose, is engaged primarily in carrying out that religious purpose, holds itself out to the public as an entity for carrying out that religious purpose, and does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts.

Under that test, World Vision is a religious corporation, so I would affirm.

---

[20]*See, e.g.*, *Deuteronomy* 6:6-7.

[21]42 U.S.C. § 2000e-2(e)(2).

BERZON, Circuit Judge, dissenting:

World Vision Inc. maintains that it is a "religious corporation, association, educational institution, or society" and so not covered by Title VII's prohibition against hiring or discharging employees on the basis of religion. *See* 42 U.S.C. § 2000e-1(a). If World Vision is right, then it may refuse to hire, and may fire, on the basis of their religious beliefs individuals—like the plaintiffs here—whose jobs have no religious element at all.

Judges O'Scannlain and Kleinfeld agree that World Vision qualifies for the exemption and so can insist that *all* of its employees share the organization's belief that "Jesus Christ is God and a member of the Trinity." My colleagues arrive at this conclusion by fashioning a brand new test for applying the Title VII religious organization exemption.[1] Under that newly minted standard, any entity can claim the exemption "if that entity is organized for a religious purpose, is engaged primarily in carrying out that religious purpose, holds itself out to the public as an entity for carrying out that religious purpose, and does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts." Per Curiam Opinion.

This test would allow a broad range of organizations to refuse to hire and to fire any employee on the basis of religious belief, including organizations that lack any ties to organized religion and perform daily operations entirely secular in nature. As a result, the majority's approach would transform what has always been a narrow exemption from the general prohibition on religious discrimination into an exceedingly

---

[1] I refer to § 2000e-1(a) as the "religious organization exemption." It is the broadest of several Title VII provisions, discussed below, that carve out religious entities for special treatment. Only § 2000e-1(a) permits religious organizations to hire and fire on the basis of religion without regard to the employee's function within the organization.

broad one, with no obvious stopping point. I explain below that this expansive standard for invoking the exemption contravenes our precedent and the clear language of the statute while fostering the very problem of religious-based inquiries it seeks to cure.

**I.**

The majority's characterization of defendant World Vision's focus and activities is fully accurate. I pause here to emphasize several facts that become significant in the discussion that follows.

According to its website, World Vision is "a Christian humanitarian organization dedicated to working with children, families and their communities worldwide to reach their full potential by tackling the causes of poverty and injustice." Four of World Vision's six core "ministries" are described in purely secular terms: caring for children by providing clean water, health care, food and clothing; building self-reliance through technological innovation and training; emergency relief; and educating Americans about global poverty. Although World Vision lists "evangelism" as a ministry, it "never proselytize[s]." Instead, it "integrates Christian activities" into its outreach work by working with local churches and "arrang[ing] for interested children to attend events such as Bible camps or clubs so they can learn more about the Christian faith." World Vision does not require or urge aid recipients to participate in religious worship or instruction, although it does "offer those opportunities."

World Vision also does not ordain ministers, and it is not affiliated with any particular church. Partnering with a wide variety of churches, including Methodist, Catholic, Episcopal, Lutheran, and independent sects, World Vision does not require representatives of those churches involved in World Vision activities to sign any document affirming their com-

mitment to the Apostles' Creed or World Vision's Statement of Faith.

Finally, the plaintiffs performed completely secular job duties. Spencer worked in a department that provided facilities upkeep; Youngberg worked as a purchaser, warehouse technician, and scheduler; and Hulse was an administrative assistant. World Vision fired them because, although they continued to be practicing Christians, they no longer believed in the Trinity, the idea that "the father, son and holy ghost are one and the same."

## II.

Two earlier Ninth Circuit cases provide guidance—or should, the majority's determination to push them aside notwithstanding—in assessing whether World Vision falls within the exemption's intended scope.

The first, *EEOC v. Townley Engineering & Manufacturing Company*, 859 F.2d 610 (9th Cir. 1988) considered whether the exemption covered a for-profit company founded as a "Christian, faith-operated business" and producing mining equipment. *Id.* at 611-12 (quotations omitted). Addressing that question, we began from the proposition that "Congress's conception of the scope of [the exemption] was not a broad one. All assumed that only those institutions with extremely close ties to organized religion would be covered. Churches, and entities similar to churches, were the paradigm." *Id.* at 618. To determine whether an organization falls within the exemption, we said, "[a]ll significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious." *Id.*

In *Townley*, the employer enclosed Gospel tracts in outgoing mail; printed Bible verses on invoices and purchase orders; donated money to churches and other religious entities; and conducted weekly prayer meetings for employees.

Nonetheless, Townley was held primarily secular and so not a "religious corporation," because it was for-profit and unaffiliated with any church, its articles of incorporation included no religious purpose, and it produced a secular product. *Id.* at 619.

The second seminal Title VII religious exemption case in this court, *EEOC v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458 (9th Cir. 1993), involved a group of related schools founded pursuant to a bequest that required that all teachers be Protestants. To determine whether the Schools came within the exemption, we considered their purpose, faculty, student body, student activities and curriculum, as well as the fact that the Schools were unaffiliated with any church, and concluded that "the religious characteristics of the Schools consist of minimal, largely comparative religious studies, scheduled prayers and services, quotations of Bible verses . . . and the employment of nominally Protestant teachers." *Id.* at 463. The Schools, in sum, were "an essentially secular institution operating within an historical tradition that includes Protestantism" and, as such, ineligible for the exemption. *Id.* at 463-64.

Taken together, *Townley* and *Kamehameha Schools* direct us to consider whether an organization may avail itself of § 2000e-1's exemption by applying two broad, interwoven principles. First, "[a]ll significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious." *Townley*, 859 F.2d at 618. Second, "[w]e construe the statutory exemption[ ] narrowly," with the understanding that "only those institutions with extremely close ties to organized religion [are] covered." *Kamehameha Sch.*, 990 F.2d at 460. The majority's test departs from both principles, as I explain below.

## III.

The first principle established by *Townley* and *Kamehameha Schools* is one of methodology—that an understanding

of whether an organization is "primarily religious" requires an assessment of observable religious and secular aspects of an organization's purposes and activities—that is, a fact-based, functional inquiry. Permitting self-definition by purportedly religious organizations, as my colleagues would allow, cannot be reconciled with this principle.

The majority acknowledges that *Kamehameha Schools* and *Townley* focused on the observable religious or secular nature of the organizations' attributes, but justifies departing from this approach by asserting that those cases "contain[ ] no indication that the religious or secular nature of any particular activity or purpose was in dispute." *See* Concurrence of O'Scannlain, J. at 1417. This portrayal of our precedents is wrong. Close inspection of *Kamehameha Schools*, in particular, reveals that the characterization of particular attributes as religious or secular was, in fact, hotly contested by the parties.

*Kamehameha Schools* held the Schools' purpose secular despite the Schools' insistence that "the purpose of the Schools is primarily religious." Brief of Defendant-Appellee at 25, *Kamehameha Sch.*, 990 F.2d 458 (No. 91-16586). The Schools argued that they "ha[d] steadfastly remained primarily religious in purpose . . . for over a century. . . . it is [our] purpose not only to provide education, but to provide such education in a Protestant Christian atmosphere which pervades every aspect of campus life." *Id.* at 20. As evidence of its religious purpose, the Schools cited the existence of the Bishop Memorial Church as "an integral part" of school life; daily prayer in classrooms; the presence of an ordained minister as chaplain; and a religious coursework requirement. *Id.* at 21. Our independent review of documents created and distributed by the Schools, however, led us to the conclusion that the Schools' "mission" was "to help native Hawaiians 'participate in contemporary society for a rewarding and productive life' by providing a solid education . . . and the moral guidance necessary to help students 'define a system of values.'" *Kamehameha Sch.*, 990 F.2d at 465 (brackets omitted). We

rejected the Schools' claim that their central purpose was religious, observing that "the purpose and emphasis of the Schools have shifted over the years from providing religious instruction to equipping students with ethical principles that will enable them to make their own moral judgments." *Id.* at 462.

The religious nature of the Schools' curriculum was also in dispute. The Schools pointed to their curriculum as evidence that the Schools were "primarily religious," emphasizing that Bible stories were taught by "Christian education teachers" starting in kindergarten and by an ordained minister starting in seventh grade, and that completion of the "Ekalesia" religious instruction program was a graduation requirement. *See* Brief of Defendant-Appellee at 26, 29. We found that despite these requirements, secular instruction outweighed the religious elements of the curriculum, noting that the Schools "offer a complete array of courses in math, science, English, languages, and social studies, all of which are taught from a secular perspective. No effort is made to instruct students in Protestant doctrine." *Kamehameha Sch.*, 990 F.2d at 463. Characterizing the curriculum as containing "minimal, largely comparative religious studies" and noting that "[r]eferences to Bible verses, comparative religious education, and even prayers and services are common at private schools and cannot suffice to exempt such schools from § 2000e-1," we rejected the Schools' contention that they were a religious organization for purposes of Title VII and so allowed to hire and fire employees based on religious belief.[2] *Id.*

The majority's test cannot be squared with our precedent

---

[2]The majority characterizes this inquiry as assessing the "quantum" of "admittedly religious activity at the school." *See* Concurrence of O'Scannlain, J. at 1417 n.11. The observation that the Schools' religious studies program was "largely comparative" and involved no instruction in Protestant doctrine, however, entails an assessment of the nature—the quality—of the allegedly religious activity, not merely its quantity.

on the grounds that in *Kamehameha Schools* the "character-izations [of the organizations' attributes] were not our own." *See* Concurrence of O'Scannlain, J. at 1417. The Schools had *not* conceded that their purpose had shifted from religious to secular, nor that the religious components of the curriculum were "minimal." Rather, those conclusions were derived from our careful analysis of observable religious and secular attributes. Our precedent requires the same method here.

The majority correctly observes that "our case law does not compel us to march down a checklist of considerations" in assessing whether an organization is "primarily religious," nor does it compel "rigid adherence" to the factors considered by *Townley* or *Kamehameha Schools*. *See* Concurrence of O'Scannlain, J. at 1411. The relevant characteristics will depend on the type of institution invoking the exemption.[3] The variable nature of the inquiry, however, does not relieve us of our obligation to assess "[a]ll significant religious and secular characteristics." *Kamehameha Sch.*, 990 F.2d at 460. As it is clear that *Kamehameha Schools*, which relied upon *Townley*, cannot be distinguished on the grounds that the characterization of particular attributes as secular or religious was undisputed, we are compelled to follow the mode of analysis prescribed in our two precedential cases. *See*, *e.g.*, *United States v. Hernandez-Castro*, 473 F.3d 1004, 1008 (9th Cir. 2007).

## IV.

The second principle firmly established by *Townley* and *Kamehameha Schools* is a substantive one—that Congress

---

[3]The district court's reliance on *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217 (3d Cir. 2007), was error not because *LeBoon* used slightly different factors to assess whether the organization was primarily religious but because the Third Circuit's refusal to read the statutory exemption as narrowly focused on churches and entities similar to churches, *see id.* at 231, directly conflicts with our precedents, as I explain *infra* in Part III.

intended the § 2000e-1(a) exemption to apply narrowly, covering "only those institutions with extremely close ties to organized religion . . . Churches, and entities similar to churches, were the paradigm." *Kamehameha Sch.*, 990 F.2d at 460 (quoting *Townley*, 859 F.2d at 618).[4] This narrow reading of the exemption to cover entities that, like churches, exist for the purpose of prayer and religious instruction is required by the plain meaning of the statutory terms and the structure of the statute. When "the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end." *Moski v. M.J. Cable, Inc.*, 481 F.3d 724, 732 (9th Cir. 2007).

The majority's test would permit a broad variety of religiously influenced organizations to employ only individuals with prescribed religious beliefs in jobs with no religious function. Whether or not that would be a superior rule, it is one impossible to reconcile with the clear text of the statute.

## 1.

Title VII's religious organization exemption provides:

> This subchapter shall not apply . . . to a religious corporation, association, educational institution, or soci-

---

[4]The majority discounts the language in *Townley* limiting the exemption to churches and church-like entities because it occurred within a discussion of the provision's legislative history—a discussion, as we later observed in *Kamehameha Schools*, 990 F.2d at 460-61 n.5, upon which our holding in *Townley* did not depend. Yet, Townley did not rely solely on legislative history to conclude that the exemption was narrowly applicable to churches and related entities, but also upon cases interpreting the statute, which "demonstrate that the central function of [the provision] has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities." *Townley*, 859 F.2d at 618. Moreover, as I discuss below, the legislative history confirms that Congress used the terms "religious corporation, association, educational institution, or society" as they were commonly understood rather than in some specialized sense unique to Title VII and is useful to that degree.

ety with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). As I develop below, at common law and in contemporary common legal usage, "religious society" meant a community organized for worship; "religious corporation" referred to a religious society that incorporated to achieve a form that was legally cognizable under civil law. *See*, *e.g.*, *Jones v. Wolf*, 443 U.S. 595 (1979) (using "church," "religious society," and "religious association" interchangeably). "Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Evans v. United States*, 504 U.S. 255, 259 (1992) (quotations and brackets omitted). We must therefore assume that Congress used the terms "religious corporation, association . . . or society" as they were commonly understood: to describe a church or other group organized for worship, religious study, or the dissemination of religious doctrine.[5]

When Congress enacted the religious organization exemption, the term "religious society" had long been used in legal

---

[5]Contrary to the majority's assertion, Maj. Op. at 12534, there is an obvious reason why Congress did not use the word "church" in enacting the religious corporation exemption: It describes a place where Christians pray. *See* MERRIAM-WEBSTER COLLEGIATE DICTIONARY 205 (10th ed. 1993) (defining "church" as "a building for public and esp[ecially] Christian worship"). Jews, Muslims, Buddhists, and adherents of many other religions do not worship at churches, but they do form societies for the purpose of prayer and religious instruction. Moreover, "church" commonly refers to a physical entity, as the definition above indicates, while Congress sought to exempt *groups* organized for worship or religious study. Accordingly, I agree with Judge Kleinfeld that organizations such as the Falun Gong, the Quakers, or Mother Theresa's mission should not be classed as secular solely because certain of their activities occur outside of a physical church. *See* Concurrence of Kleinfeld, J., at 1438.

parlance to apply to organizations formed for the central purpose of communal worship and religious study. *See, e.g.*, *Mordecai F. Ham Evangelistic Ass'n v. Matthews*, 189 S.W. 2d 524, 527 (Ky. 1945) ("The term 'religious society' is an old one . . . it has had a well-understood meaning, being used interchangeably with 'church' or some group organized and maintained for the support of public worship."); *U.S. Nat'l Bank v. Poor Hand Maids of Jesus Christ*, 135 N.W. 121, 122 (Wis. 1912) ("The term 'religious society' . . . has often been construed by courts. . . . It is a body of persons who usually meet in some stated place for worship of God and religious instruction."); *State v. Stuth*, 39 P. 665, 666 (Wash. 1895) ("The words 'religious society' . . . have their ordinary meaning, and would include all religious societies or congregations met for public worship."). This usage has remained unchanged since enactment of Title VII's religious exemption. *See, e.g.*, *Parshall Christian Order v. Bd. of Review, Marion County*, 315 N.W.2d 798, 802 (Iowa 1982) ("A 'religious society' has been defined to be 'a voluntary association of individuals . . . united for the purpose of *having a common place of worship* and *to provide a proper teacher to instruct them* in religious doctrines and duties.' " (citation omitted)).

While "religious association" does not appear to have a distinct meaning, the Supreme Court has deployed the term as a synonym for "church." *See, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 114 (1952) (noting the "[unquestioned] right to organize voluntary religious associations to assist in the expression and dissemination of . . . religious doctrine" (quoting *Watson v. Jones*, 80 U.S. 679, 728-29 (1871))). Canons of statutory interpretation also suggest that "association" must be interpreted to have a similar meaning as "society" in this context. *See United States v. Alvarez-Gutierrez*, 394 F.3d 1241, 1253 (9th Cir. 2005) ("The traditional canon of construction, *noscitur a sociis*, dic-

tates that words grouped in a list should be given related meaning." (quotation omitted)).[6]

As with the terms "religious society" and "religious association," Congress must be presumed to have been aware of the established legal meaning of the term "religious corporation." That term has consistently referred to the legally-recognized form created by a religious society or association so that it could assert property and other rights under civil law. In colonial America, religious societies were able to incorporate only upon receiving special charters from the Crown or colonial legislature, rarely granted to any religious societies other than the Church of England. R.H. TYLER, THE LAW OF RELIGIOUS SOCIETIES 133, 135 (1866).[7] Incorporation thus originally symbolized state sponsorship of religion. After the American Revolution, consequently, religious societies were largely unincorporated. *See Turpin v. Locket*, 6 Call 113 (Va. 1804) (holding that, because the Church of England's privileged legal status had been eliminated by the revolution, "[t]hat church, formerly paramount and triumphant, has now taken its just and equal station with other religious societies," and therefore its religious successor, the Episcopalian Church, had no claim to its former holdings).

Without a corporate existence it was impossible for churches to hold property. The Virginia courts, for example, refused to let the Catholic Church of Richmond take possession of property bequeathed it by a donor because the Church lacked a fixed identity under the law. *See Gallego's Ex'rs v.*

---

[6]Because World Vision does not claim to be an "educational institution," the common law meaning of that term is not directly relevant here. Still, like religious societies and associations, religious educational institutions are groups organized for worship, religious study, or the dissemination of religious doctrine. The term therefore falls neatly within the *noscitur a sociis* canon of statutory construction.

[7]The very existence of treatises on the law of religious corporations, published long before Title VII's enactment, demonstrates the pedigree and settled meaning of the term.

*Att'y Gen.*, 30 Va. 450 (1832) ("[A]s the society or congregation is not incorporated . . . who are to be regarded as the beneficiaries?"). Churches therefore sought corporate status, to assure "the institutional identity that was provided by internal governance and the assurance of immortality." Liam Séamus O'Melinn, *Neither Contract nor Concession: The Public Personality of the Corporation*, 74 GEO. WASH. L. REV. 201, 223 (2006); *see, e.g.*, *Kedroff*, 344 U.S. at 128 (Jackson, J., dissenting) ("[T]his denomination wanted the advantages of a corporate charter for its Cathedral, to obtain immunity from personal liability or other benefits."); *Baltimore & P.R. Co. v. Fifth Baptist Church*, 108 U.S. 317, 330 (1883) ("[T]he Fifth Baptist Church[ ] was incorporated that it might hold and use an edifice, erected by it, as a place of public worship for its members . . ."). States responded by passing statutes permitting religious societies to incorporate. *See, e.g.*, MCKINNEY'S RELIGIOUS CORPORATIONS § 4 (permitting "property of an unincorporated church, or . . . religious society, body, association or congregation" to become the property of the corporation upon incorporation); 13 Maine Rev. Stat. § 2861 (establishing a procedure for any group "desirous of becoming an incorporated parish or religious society"); N.H. Rev. Stat. § 306:4 ("[T]rustees, deacons, church wardens or other similar officers of churches or religious societies . . . shall be deemed bodies corporate . . ."); Mass. Gen. Laws 67 § 23 (establishing a process by which those "who desire to form a religious society . . . shall become a corporation"); Conn. Gen. Stat. § 33-264d ("Any religious society may become a religious corporation . . . .").

The term "religious corporation" thus had a clear and universal meaning at the time Congress enacted § 2000e-1(a) of Title VII: It referred to the legally cognizable form of a religious society, which in turn was commonly understood to mean a church or similar entity organized for the purpose of worship. *See* BLACK'S LAW DICTIONARY 368 (8th ed. 2004) (defining "religious corporation" as "a corporation created to carry out some ecclesiastical or religious purpose"). Entities

consisting of coreligionists but organized around secular purposes or activities were outside the term's scope. *See State v. Hutterische Bruder Gemeinde*, 191 N.W. 635, 643 (S.D. 1922) (holding that an organization whose principal purpose was farming and only "lastly and secondarily" religion was not a religious corporation); *Franta v. Bohemian Roman Catholic Cent. Union*, 63 S.W. 1100, 1102 (Mo. 1901) (holding that a Catholic fraternal beneficiary society was "in no sense a religious corporation. It is not formed to teach or propagate the religious faith, but to cultivate the spirit of fraternity among its members . . . .").

In short, in delineating the statutory exemption Congress chose words that, through a long common law and statutory history, signified organizations that existed for the purpose of worship and religious learning. Given that established understanding, the plain meaning of the language used conforms with—indeed, dictates—the narrow scope for the exemption recognized in *Townley* and *Kamehameha Schools*.[8] Neither Judge O'Scannlain nor Judge Kleinfeld explains why this Court should depart from the traditional presumption that Congress intended these terms of art to retain their traditional common law and statutory meanings.

**2.**

A structural analysis of Title VII as a whole supports this

---

[8]Contrary to Judge Kleinfeld's concurrence, the narrow scope of the religious organization exemption accords with Title VII's definition of "religion" as including "all aspects of religious observance and practice." *See* Concurrence of Kleinfeld, J., at 1436 (citing 42 U.S.C. § 2000e(j)). This statutory definition applies to use of the term "religion" throughout Title VII, including to the general prohibition against discrimination in employment practices because of an individual's religion. 42 U.S.C. § 2000e-2. This definition, however, sheds no light on the scope of the *exemption* from the prohibition against religious discrimination. The current dispute concerns the meaning of "religious corporation, association . . . or society," not the term "religion."

conclusion. Section 2000e-1(a) is one of three exceptions carved out of Title VII for the purpose of accommodating religious freedom. There is, in addition, a judicially-created "ministerial" exception designed to address this concern. When viewed in the context of the other exceptions, it becomes clear that the exemption at issue here serves a purpose unique to churches and other pervasively religious societies and is meant to be confined to such associations.

First, courts have carved out a broad "ministerial exception" to Title VII "in order to insulate the relationship between a religious organization and its ministers from constitutionally impermissible interference by the government." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004) (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 945 (9th Cir. 1999)). The ministerial exception doctrine holds that the federal constitution's Establishment and Free Exercise Clauses require courts to "defer without further inquiry" to "decision-making about who shall be a minister of the Church," even if the decision is based on a classification, such as race or sex, otherwise proscribed by Title VII. *Id.* at 958. The doctrine thus forbids judicial review of the doctrinal reasons asserted for discriminating on a proscribed basis with regard to ministers. *See id.* at 961.

Moreover, any organization may "hire and employ" on the basis of religion where religion is a "bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1); *see Kamehameha Sch.*, 990 F.2d at 465.[9]

---

[9]This subsection also contains a clause permitting educational institutions affiliated with a particular religion, or teaching a curriculum directed toward propagating a particular religion, to hire and employ on the basis of religion. 42 U.S.C. § 2000e-2(e)(2). This exception overlaps with the inclusion of "educational institution" in the exemption at § 2000e-1(a). *See Kamehameha Sch.*, 990 F.2d at 464 (concluding that the Schools were not exempt under the religious curriculum exception). As World Vision does not claim to be exempt as a religious educational institution, the scope and impact of the possible redundancy regarding religious educational institutions is not relevant to our analysis.

Secular organizations may rely on the BFOQ exception. *See Kern v. Dynalectron Corp.*, 577 F. Supp. 1196 (N.D. Tex. 1983), *aff'd*, 746 F.2d 810 (5th Cir. 1984) (holding that a helicopter company was entitled to require that all pilots flying into Mecca convert to Islam because under Saudi Arabian law non-Muslims were forbidden to enter Mecca on penalty of death). If World Vision does not qualify for the 2000e-1 exemption, it may well have a strong argument that belief in World Vision's Statement of Faith or the Apostles' Creed is a BFOQ for employees directly involved in carrying out World Vision's religiously-motivated humanitarian mission by offering humanitarian outreach and, where appropriate, Christian ministry to poor families. *See Pime v. Loyola Univ. of Chi.*, 803 F.2d 351 (7th Cir. 1986) (holding that membership in the Jesuit order was a BFOQ for filling tenure-track professorships because maintaining an adequate Jesuit presence was important to the successful operation of a Jesuit-affiliated university).

The overall statutory scheme of Title VII makes clear that the religion-based exceptions are narrowly tailored to achieve distinct purposes. As any organization may, under the BFOQ provision, base particular hiring decisions on religious affiliation to the extent required by operational necessity, § 2000e-1(a) serves the distinct purpose of permitting organizations exclusively devoted to propagating religion to conduct all their activities within a community composed wholly of co-religionists. For such entities, "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is [ ] a means by which a religious community defines itself." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). The language and overall structure of Title VII indicate that Congress believed only entities like churches, whose religious character is so pervasive that it defines their entire organizational mission and

daily activities, stand in need of this organization-wide exemption.

Identifying the interaction of these exemptions responds to Judge Kleinfeld's concern that a Protestant religious association might be required to hire atheists, Jews, or Catholics to perform Protestant missionary work. Concurrence of Kleinfeld, J., at 1436-37 First, such a group may fit within § 2000e-1(a) if organized for the dissemination of religious doctrine. Second, an association falling outside the narrow confines of § 2000e-1(a) might still argue that religious affiliation is a BFOQ for employees performing missionary work.

*Townley*'s statement, reaffirmed in *Kamehameha Schools*, that the exemption is limited to churches and similar entities is thus entirely consistent with the commonly understood meaning of the terms in the provision and the structure of the statute as a whole. To stretch the exemption, as my colleagues now do, to encompass entities organized around secular activities conducted with an assertedly religious motivation surely violates Congress's intent.

## V.

My colleagues' approach is not only at odds with our precedent and the plain meaning of the statute. The attempt to escape from our precedent is driven by the misguided thesis that any inquiry into the activities of an avowedly religious organization is constitutionally suspect. Although the majority would subvert our precedent and the plain meaning of the statute in the name of a nonexistent constitutional problem, these new tests fail to resolve the constitutional issue that troubles my colleagues.

### 1.

Under the majority's newly minted standard, we must accept without inquiry the parties' own characterizations of

particular institutional attributes as either religious or secular, as any judicial analysis of a purportedly religious organization's activities or purpose is "constitutionally troublesome." *See* Concurrence of O'Scannlain, J., at 1412. The majority invokes Amos for this proposition, but *Amos* is not controlling in this case. All the parties in *Amos* agreed that the employer, a nonprofit gymnasium wholly owned by the Mormon Church, was entitled to the religious organization exemption. *Amos*, 483 U.S. at 331 n.3. The issue of how to assess which organizations are within the religious exemption was thus not before the Court.[10]

Instead, the question in *Amos* was whether Congress's expansion of the exemption to permit religious organizations to discriminate with respect to non-religious jobs unconstitutionally advanced religion in violation of the Establishment Clause. *Id.* at 330. So, when the Supreme Court in *Amos* stated that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious," *id.* at 336, it was not demarcating the constitutional boundaries of the judicial inquiry into whether an *institution* qualified as religious. Moreover, the opinion for the Court expressly assumed that the prior version of the exemption, which previously applied only to the religious activities of religious employers, *id.* at 333 n.9, did not raise any constitutional free exercise issue. *Id.* at 336. *Amos* held only that the broader, amended version of the exemption satisfied the test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and so was not an establishment of religion. Noting that lessening government inter-

---

[10]Indeed, Justice Brennan's repeated reference to "churches" demonstrates that his solicitude for religious organizations' right to define themselves by restricting their community to coreligionists was reserved for churches and their subsidiaries. *See, e.g.*, *Amos*, 483 U.S. at 342-43 (Brennan, J., concurring) ("While a *church* may regard the conduct of certain activities as integral to its mission, a court may disagree.") (emphasis added); *see also id.* at 342-45 (seven other references to "church" in Justice Brennan's concurring opinion).

ference with religious organizations' ability to conduct their missions was a permissible governmental purpose under *Lemon*, the Court held that, even assuming the earlier version of the statute was all that the religion clauses required, the burden enunciated above was adequate to justify congressional action. *Id.* at 335-36. Approving Congress's efforts to minimize inquiry into the activities of concededly religious organizations does not establish that such an inquiry would be constitutionally invalid, or that similar concerns arise when ascertaining whether a purportedly religious organization is in fact religious within the meaning of § 2000e-1(a). In short, *Amos* is of little relevance to the question of statutory interpretation we face.

The majority also cites *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979), for the proposition that "the very process of inquiry leading to findings and conclusions" with respect to the secular or religious nature of a particular activity impinges on First Amendment rights. *See* Concurrence of O'Scannlain, J., at 1414. *Catholic Bishop*, however, reflects concerns directed at "the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Id.* at 501; *see also Universidad Central de Bayamon v. NLRB*, 793 F.2d 383, 404 (1st Cir. 1986) (en banc) ("[T]he Supreme Court was not concerned simply with general state regulation of a religious educational institution. . . . the Court saw teachers in parochial schools as essentially servants of the Church in carrying out [the schools'] religious missions."). We have accordingly declined to apply *Catholic Bishop* to employees other than teachers in religious schools. *See NLRB v. Hanna Boys Ctr.*, 940 F.2d 1295, 1301 (9th Cir. 1991) ("Other employees of parochial schools, whether professional or 'blue collar,' are expressly excluded from the ruling." (citation omitted)). And, in contrast to § 2000e-1(a), which exempts all employees of religious organizations, *Catholic Bishop* left intact the National Labor Relations Board's jurisdiction over non-teacher employees of religious organizations.

Moreover, *Catholic Bishop*'s rule of constitutional avoidance is only available when it rests on a "plausible interpretation[ ] of a statutory text." *Clark v. Suarez Martinez*, 543 U.S. 371, 381 (2005). *Catholic Bishop* found no congressional intent embodied in the National Labor Relations Act to subject teachers in church-operated schools to the jurisdiction of the National Labor Relations Board. Here, Congress's clear intent was to prohibit discrimination on the basis of religion, 42 U.S.C. § 2000e-2(a), subject only to a narrow exemption. As I have explained, the text of that exemption reveals that it was applicable to organizations devoted to worship and religious instruction—"churches, synagogues, and the like, and organizations closely affiliated with those entities." *Townley*, 859 F.2d at 618. As the constitutional avoidance canon is "a means of giving effect to congressional intent, not of subverting it," *Clark*, 543 U.S. at 382, it cannot be relied on to create a test for the Title VII religious organization exemption at odds with the language of the statute.

The majority also maintains that *Larson v. Valente*, 456 U.S. 228 (1982), prohibits any inquiry into whether World Vision is owned by, affiliated with, or financially supported by churches, because such an inquiry would require drawing impermissible distinctions between different religious groups. *See* Concurrence of O'Scannlain, J., at 1416. In fact, the *Townley/Kamehameha Schools* approach in no way conflicts with *Larson*.

*Larson* stands only for the undisputed premise that statutes that make "explicit and deliberate distinctions between different religious organizations" are subject to strict scrutiny. 456 U.S. at 246 n.23. There, the statute at issue distinguished on its face between religious groups that were primarily member-funded and those that were not. Section 2000e-1(a) contains no such distinctions.

Nor does the *Townley/Kamehameha Schools* approach rest on "overt discrimination against a particular church," *Lynch*

*v. Donnelly*, 465 U.S. 668, 679 (1984), in any other respect. *Kamehameha Schools* specifically noted that the Schools had never been controlled or supported by a religious group and that they were unaffiliated with any religious group. 990 F.2d at 461; *see also Townley*, 859 F.2d at 619. This observation does not require a comparison between well-established churches and new ones, or a distinction between organizations owned or financially supported by a single church and those receiving support from a broad spectrum of churches (as in *Larson*), or between any other religions or types of religions. Instead, our precedents merely posit that an entity with close affiliations with churches is more likely to be primarily religious than an entity that has none at all.[11] *See Killinger v. Samford Univ.*, 113 F.3d 196, 199 (11th Cir. 1997) (considering, as evidence that a university was primarily religious under § 2000e-1(a), the fact that the university reported financially to the Alabama Baptist State Board of Missions and the Alabama Baptist State Convention). And, despite the majority's concern, the affiliation factor does not favor institutions with a denominational affiliation; an organization could present evidence of affiliation by showing that it is financially or programmatically accountable to several churches rather than just one. Here, the record does not show that World Vision answers financially or programmatically to any of the churches with which it "partners."

The majority is thus left to rely on out-of-circuit cases that interpret statutes other than Title VII. None are directly relevant, and the constitutional precepts underlying those cases are inapplicable here even by analogy.

*Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), concerned a statute that required state officials to analyze whether university theology courses "tend to

---

[11]The affiliation element can be dispositive where, as in *Amos*, the organization claiming the exemption is a wholly-owned subsidiary of a recognized religious body.

indoctrinate or proselytize," necessitating an inquiry into "how religious beliefs are derived." *Id.* at 1261-62 (quotation omitted). No such inquiry is required by the *Townley/Kamehameha Schools* functional, multifactor approach.

*University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), and *Bayamon*, 793 F.2d 383 (1st Cir. 1986) (en banc), are not pertinent because they concerned admittedly religious organizations: universities operated by Catholic orders.[12] *See Univ. of Great Falls*, 278 F.3d at 1338; *Bayamon*, 793 F.2d at 399-400. Moreover, both cases relied on *Catholic Bishop*'s interpretation of the National Labor Relations Act, which, unlike Title VII, did not delineate the scope of the exemption for religious organizations—much less do so using terms that have long applied to a narrow group of entities—and exempted teachers in church-run schools precisely because their role inevitably contained a religious component. Finally, these cases lend little support to the majority's holding, as both depend on the affiliation factor that the majority does not adopt and deems overly intrusive. *See* Concurrence of O'Scannlain, J., at 1414-15. *See Univ. of Great Falls*, 278 F.3d at 1343-44 ("It is undisputed that the University is affiliated with a recognized religious organization, that is, the Catholic Order of the Sisters of Providence." (quotations and ellipses omitted)); *Bayamon*, 793 F.2d at 399-400 (emphasizing that "[a]dministrative control of the University lies in the hands of members of the Dominican Order").

In sum, none of the cases the majority relies on as supporting a new test for applying the religious organization exemption would have traction even if we were free to rely on the doctrine of constitutional avoidance in this case—which, given the clarity of the language of the Title VII religious organization exemption, we are not.

---

[12]*Bayamon*, moreover, was the product of an evenly divided en banc panel, so neither of the two opinions is one for the court.

**2.**

More broadly, adjudicating Establishment and Free Exercise Clause claims inevitably requires distinguishing between the religious and the secular by, for example, asking whether a law evinces the purpose or has the effect of promoting religion. *See*, *e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002); *Edwards v. Aguillard*, 482 U.S. 578, 591 (1987) (invalidating a state law which required schools to teach creationism if they chose to include evolution in their curricula because it was motivated by "the teachings of certain religious denominations"); *Stone v. Graham*, 449 U.S. 39, 41 (1980) ("The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature."). Preserving the proper balance and distance between church and state necessarily involves courts in examining activities that are avowedly connected to religion, particularly where the organization invokes religion to seek an exemption from otherwise applicable law. *See Hanna Boys Ctr.*, 940 F.2d at 1303 (upholding the NLRB's findings of facts and rejecting the Center's contention that child care workers were "intimately involved with the students as spiritual and theological mentors"); *Westchester Day Sch. v. Vill. of Mamaroneck*, 386 F.3d 183, 190 & n.4 (2d Cir. 2004) (suggesting that the Religious Land Use and Institutionalized Persons Act requires courts to distinguish between secular and religious purposes, as "not every activity carried out by a religious entity . . . constitutes 'religious exercise' " (quoting 146 Cong. Rec. S7774-01, S7776 (July 27, 2000))); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1397 (4th Cir. 1990) (concluding, in rejecting a church-owned school's claim that the Free Exercise Clause precluded application of the Fair Labor Standards Act to its teachers, that "[t]he pay requirements at issue do not cut to the heart of Shenandoah beliefs").

Moreover, adjudication of Free Exercise and Establishment Clause claims sometimes requires courts to determine whether religious beliefs are sincerely held, *see*, *e.g.*, *Patrick*

*v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984), and to inspect a religious belief to decide whether it has been substantially burdened by state action. *See*, *e.g.*, *May v. Baldwin*, 109 F.3d 557, 562-63 (9th Cir. 1997) (discussing the significance of dreadlocks within the Rastafarian religion); *Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (discussing the importance of observing the Eid ul Fitr feast to the plaintiff's practice of Islam). When determining whether an entity is covered by an exemption that, by its express terms, applies only to religious organizations, "federal courts cannot always avoid taking a stand on a religious question." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006).

Indeed, Title VII's other religious organization exceptions require judicial inquiry of the kind that the majority condemns as constitutionally invalid. To apply the ministerial exception doctrine, for example, we examine the actual functions of the employees said to be within the exception. *See Elvig*, 375 F.3d at 958 (noting that courts "look[ ] to the function of the position rather than to ordination in deciding whether the ministerial exception applies to a particular employee's Title VII claim"); *see also Dole*, 899 F.2d at 1396 (rejecting application of the ministerial exception to teachers who "perform no sacerdotal functions . . . [and] belong to no clearly delineated religious order"); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) ("The faculty members . . . neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine."). Civil courts are "incompetent judges of matters of faith, discipline, and doctrine," *Watson*, 80 U.S. at 732 (quotations omitted), but whether a particular church employee functions as a minister is a nondoctrinal matter.

It cannot be, as the majority suggests, *See* Concurrence of O'Scannlain, J., at 1413, that courts are constitutionally prohibited from ascertaining a purportedly religious organization's purpose when the test for assessing "whether [ ] government entanglement with religion is excessive" requires

courts to "examine the character and purposes of the institutions" involved. *Lemon*, 403 U.S. at 615. If *any* judicial action beyond simply accepting the representations of a purportedly religious organization were "constitutionally troublesome," courts would be incapacitated entirely from policing the boundaries of the constitution's religion clauses. Avoiding entirely such inquiry cannot be the fulcrum for an otherwise implausible statutory interpretation.

**3.**

Finally, even if the majority's theory—that *Townley* and *Kamehameha Schools*' functional inquiry requires both impermissible differentiation between religions and unavoidable intrusion into doctrinal matters—were correct, the majority's solution does not solve the problem my colleagues perceive. Our case law applying the statutory exemption only to churches and entities like churches is in fact less intrusive than the test adopted by my colleagues. While the majority purports to avoid judicial entanglement in religious doctrine by deferring entirely to the self-characterization of any organization seeking to claim the exemption, that approach inevitably requires courts to "troll[ ] through a person's or institution's religious beliefs," *Mitchell v. Helms*, 530 U.S. 793, 828 (2000), if it is to be applied in any meaningful way.

To see why, let us suppose that, after our decision in *Townley*, the mining company's owners reincorporated the entity as a nonprofit and revised its articles of incorporation to describe its purpose as "sharing the Gospel of the Lord Jesus Christ by creating a community of individuals with common religious beliefs and providing a means for them to advance God's purpose and fulfill their corporeal needs by joining in the manufacture of mining equipment." The Townleys could then come before us and point out that the organization's articles of incorporation include "a self-identified religious purpose," and its conduct, including holding weekly prayer sessions and extending financial support for churches and other religious

entities, is "consistent with and in furtherance of" that religious purpose. Finally, by including Gospel tracts in all outgoing mail and printing Bible verses on all documents, Townley could maintain that it "holds itself out to the public as religious." *See* Concurrence of O'Scannlain, J., at 1419; Concurrence of Kleinfeld, J., at 1443-44.

Under my colleagues' standard, we would then have no choice but to consider whether the revisions in the mining manufacturer's format and self-presentation qualify it as a "religious corporation." Do the corporation's activities sufficiently further its "self-identified religious purpose," in light of the fact that there is only the most tenuous relationship between that purpose and manufacturing mining equipment? Such an inquiry would necessarily require an intrusive assessment into the import and sincerity of the proffered religious beliefs. And were we to reject such an inquiry as constitutionally prohibited, we would be forced to disregard the fact that the manufacture of equipment remains the organization's primary operational pursuit and that there is nothing more than the asserted religious beliefs of the organization's founders to connect that secular activity to the stated religious purpose. Yet, under our precedent such beliefs, even if sincere, "are simply not enough . . . to make [a] corporation 'religious' within the meaning of [the statute]." *Townley*, 859 F.2d at 619.

Judge Kleinfeld suggests that "looking at how an institution charges" remedies this problem: "If money is not available as an incentive, that is strong evidence, in the purportedly religious institution, that exercise of religion is the objective." Concurrence of Kleinfeld, J., at 1443. In many cases this observation is undoubtably true. But just as nonprofit status is often a poor indicator of religious purpose, so too is an answer to the question whether the entity engages in the "exchange of goods or services for money beyond nominal amounts." *Id.* at 1444. The mining company in *Townley* could establish an entity satisfying Judge Kleinfeld's standard, with

a purportedly religious purpose. Such an entity could still have a business impact, by reflecting positively on the profit-making company's corporate image and boosting the company's bottom line. Judge Kleinfeld's solution, then, would not resolve my concerns with the majority's standards.

In contrast, the approach mandated by *Townley* and *Kamehameha Schools* allows us to ensure that the exemption is applied narrowly without delving into sensitive doctrinal matters. *See Jones*, 443 U.S. at 603-05 (approving an approach that applied neutral legal principles to a church schism dispute, rejecting the dissent's suggestion that "a rule of compulsory deference [to religious authority] would somehow involve less entanglement of civil courts in matters of religious doctrine"). That approach does not require analysis of "how religious beliefs are derived" or whether the organization's "actions were mandated by its religious creeds." *Colo. Christian Univ.*, 534 F.3d at 1262, 1264 (quotations, citations and brackets omitted). Nor does it demand that we define "who is a 'Christian.' " *Id.* at 1265. Instead, our precedent focuses on observable, functional, and largely self-reported attributes such as an institution's daily activities and the documents and procedures that govern them, the community it serves, and its formal affiliation with religious bodies or lack thereof. And it is an inquiry with a focus, directed at the ultimate end of deciding whether the organization is a church or church-like organization—that is, an organization traditionally referred to as a "religious corporation, association . . . or society." 42 U.S.C. § 2000e-1(a). In undertaking that inquiry, we decidedly do *not* presume to "decide what policies are entailed by . . . the institution's religious beliefs." *Colo. Christian Univ.*, 534 F.3d at 1264.

To the extent that the majority's concern that our inquiry requires excessive entanglement in religious doctrine has any validity, a different approach might address these concerns while preserving Congress's intent with respect to the exemption's scope. If we were at liberty to alter the inquiry estab-

lished in *Townley* and *Kamehameha Schools*, I would suggest that we ask *only* whether the primary activity of a purportedly religious organization consists of voluntary gathering for prayer and religious learning. This approach would even better match our analysis to the centuries-old definition of religious society while avoiding the questions of affiliation and purpose that, however unnecessarily, trouble the majority.[13] But I am no more free to adopt that approach than my colleagues are to adopt theirs. Moreover, as the *Townley/Kamehameha Schools* approach is focused on answering the same essential question—whether the institution in question possesses the centuries-old characteristics of a "religious society"—I would adhere to our precedents, which adequately narrow our inquiry to avoid any significant court entanglement in religious doctrine.

## 4.

I conclude by applying the analysis our precedent requires to determine whether World Vision is a religious organization within the meaning of § 2000e-1(a). World Vision's Christian beliefs are strongly evident in its articles of incorporation, operational policy, and other foundational documents. It hires only co-religionists and provides religious services, albeit for staff only. Indeed, "staff spiritual formation" is a major part of World Vision's religious programming.[14]

Still, World Vision is not managed, controlled, or operated by, or affiliated with, any particular church. World Vision "partners" with a broad variety of churches—not only the

---

[13]Contrary to the majority's assertion, *seeSee* Concurrence of O'Scannlain, J., at 1415 n.8, "prayer" provides a judicially cognizable standard. *See Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 280 (4th Cir. 2005) (noting that *Marsh v. Chambers*, 463 U.S. 783, 792 (1983), "defines . . . prayer as an act to 'invoke Divine guidance' ").

[14]When a World Vision officer was asked about conducting religious services in conjunction with humanitarian outreach, she responded by citing the weekly chapel services for staff.

Protestant churches that share World Vision's faith, but also Catholic, Muslim, and Jewish religious groups. World Vision is not at all accountable to these churches but only to its own Board of Directors. The Board "must have representation from . . . church and ministry leadership," but also from non-church personnel who have worked among the poor, have experience in financial management, and have ties to a "major donor community."

World Vision claims that 84% of its private cash contributions come from churches or individual coreligionists that share its faith but points to nothing besides the conclusory statements of World Vision officers ("We know that our supporters are committed Christians") for the proposition that individual donors are motivated to give by their shared faith. Moreover, cash contributions account for less than half of World Vision's revenue, with the remainder coming from government grants and gifts-in-kind.

World Vision provides some religious materials to those it assists in the countries where it provides humanitarian aid, through programs like "Youth Bible Curriculum," "Community Bible Reading," "Scripture Search," and "Children in Christ." World Vision's Church Partnerships are intended to "help churches of every denomination work effectively together." While World Vision maintains that it "could" include prayer services in its charitable work, the record contains only one description of such an event.

Moreover, World Vision does not represent that church outreach or other explicitly Christian work comprises the majority of its daily operations. Instead, the vast majority of World Vision's work consists of humanitarian relief, including "provid[ing] school supplies, clothes, toys, household goods and building supplies," to U.S. citizens and providing potable water, emergency medical care, and vocational training to refugees and vulnerable populations throughout the world, distributing condoms to reduce the spread of HIV

among sex workers, improving the transparency and responsiveness of legislative bodies, improving child and maternal health, and preventing HIV infection.

Ultimately, I am convinced that, considering the factors emphasized in *Townley* and *Kamehameha Schools*, World Vision is not a religious corporation, association or society within the meaning of § 2000e-1(a). Instead, World Vision's purpose and daily operations are defined by a wide range of humanitarian aid that is, on its face, secular. Although World Vision maintains that "Christian witness" is "integrated within" these activities, World Vision's definition of "Christian witness" encompasses all humanitarian acts, from digging a well to providing food and water to the hungry. So this circular argument leads nowhere. Only the personal religious beliefs of World Vision staff differentiate these humanitarian acts from the "ministry" that could, as World Vision concedes, be provided by people of all faiths or no faith. In short, World Vision is nothing like a church, but resembles in its primary activities a wide range of charitable organizations.

I have no doubt that "World Vision's theology compels it to serve the physical needs of the poor in the name of Jesus Christ," and I do not attempt to define "what does or does not have religious meaning" to religious adherents. *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977). *Townley* reminds us, however, that deeply-held religious beliefs do not, if combined with primarily secular activities, make the organization religious within the meaning of the statute. 859 F.2d at 619. For this reason, Judge Kleinfeld's proposal—namely, asking whether the entity "engage[s] primarily or substantially in the exchange of goods or services for money beyond nominal amounts"—does not reconcile his concurrence with *Townley*. Answering this question may illuminate an organization's motivations, but it does not transform an entity performing primarily secular activities into one organized for worship, religious study, or the dissemination of religious doctrine.

This same principle is reflected elsewhere in our case law dealing with religious exemptions. In *Volunteers of America, Los Angeles (VOA) v. NLRB*, 777 F.2d 1386 (9th Cir. 1985), a church-operated social services agency claimed that the National Labor Relations Board's exercise of jurisdiction over its employees was unconstitutional. The VOA contended, as World Vision does here, that its "activities are an integral, inseparable function of its avowed principle of serving God by serving humanity, and of serving God and humanity by deed and example." *Id*. at 1389 (quotations omitted). We held that because "[t]he VOA's social programs are expressive of a religious philosophy but are carried out in a secular fashion," Board jurisdiction did not pose a significant risk of entanglement. *Id*. at 1390. In *St. Elizabeth Community Hosp. v. NLRB*, 708 F.2d 1436 (9th Cir. 1983), we upheld Board jurisdiction over a hospital affiliated with the Sisters of Mercy, a Catholic order. Despite this affiliation, the presence of crucifixes and other religious symbols throughout the hospital, and the hospital's practice of beginning staff meetings with prayer, we held that "St. Elizabeth does not have a substantial religious character. Its primary purpose, like that of any secular hospital, is rather humanitarian, devoted to medical care for the sick." *Id*. at 1441.

More generally, we may completely credit the sincerity of religious faith, and adherents' belief that their faith mandates certain activities while still determining that the religious belief does not preclude the application of a neutral, secular law. "[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988). It may be that World Vision's staff would prefer to associate only with coreligionists. But it has not alleged that requiring them to adhere to Title VII would burden their free exercise of religion. And it is farfetched to believe that preventing World Vision from firing administrative assistants, schedulers and facilities managers because they do not subscribe to a particular Christian doctrine would

render World Vision's mission statement nothing more than a "meaningless," "nostalgic slogan," as World Vision maintains.

## CONCLUSION

Title VII's prohibition on religious discrimination aims to protect the religious freedom of employees by insulating their religious beliefs from their economic well-being. That is why "[a]ny exemption from Title VII's proscription on religious discrimination necessarily has the effect of burdening the religious liberty of prospective and current employees." *Amos*, 483 U.S. at 340 (Brennan, J., concurring). Section 2000e-1(a) reflects Congress's recognition that for a small group of employers—organizations devoted to prayer and religious instruction—the requirement to accommodate employees of different faiths could represent an unwarranted intrusion into the organizations' own freedom of religion. For those groups, on balance, the restriction of the relatively few affected jobs to those with approved religious beliefs is tolerable.

My colleagues may wish to expand that narrow exemption to entities that assert they are motivated by religious principles. But that interpretation would severely tip the balance away from the pluralistic vision Congress incorporated in Title VII, toward a society in which employers could self-declare as religious enclaves from which dissenters can be excluded despite their ability to do the assigned secular work as well as religiously acceptable employees. The consequence would be a broadened impact on the religious freedom of employees and prospective employees, who would feel compelled to reshape their religious beliefs so as to assure their economic survival.

With competing religious freedom concerns thus embedded in the delineation of a religious organization exemption, Congress struck a balance, in part by including another statutory exception to minimize interference with organizations that do

not qualify for the complete exemption from Title VII's prohibition on religious discrimination but in which certain job functions have a bona fide religious component. In striking this balance, Congress used language with a sufficiently long pedigree and established meaning to make the narrow scope of the full exemption quite clear.

I would hew to the line Congress drew and this court has heretofore respected; my colleagues would not. I respectfully dissent.